Harry GOMEZ, Petitioner–Appellant,

v.

Rodney J. AHITOW, Warden, and Roland W. Burris, Respondents–Appellees.

No. 92–4058.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1994.

Decided July 14, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 30, 1994.

Frederick F. Cohn, Chicago, IL (argued), for petitioner-appellant.

Steven J. Zick, Office of Atty. Gen., Crim. Appeals Div., Chicago, IL (argued), for respondents-appellees.

Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Petitioner Harry Gomez was convicted in Illinois state court of armed robbery and murder. Mr. Gomez filed a petition in federal district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied Mr. Gomez's petition for the writ. It determined that it was not necessary to hold an evidentiary hearing on the validity of Mr. Gomez's waiver of conflict-free defense counsel or on Mr. Gomez's claim of ineffective assistance of counsel. Mr. Gomez now appeals. For the reasons that follow, we affirm the district court's denial of the petition.

## I

## BACKGROUND

At approximately 6:30 a.m. on January 1, 1984, a man on his way to church discovered the body of Gilbert Perez in an alley near the intersection of West St. Paul and Northwestern Avenues in Chicago.[1] Chicago police officers were called to the scene. Their investigation revealed that Perez had suffered two massive shotgun wounds to the body and at least one shotgun wound to the head. Later that month, the Chicago police received an anonymous telephone call about the Perez homicide; the caller linked the crime to a car having the license number AA 959.

---

1. Our recitation of the facts is based on the Illinois appellate court's rendition in *People v.* *Gomez*, 178 Ill.App.3d 1158, 141 Ill.Dec. 649, 551 N.E.2d 836 (1st Dist.1989). *See* R.26.

They also interviewed a woman named Nancy LeBron. However, as the result of fears stemming from the nature of the case, it was not until November 1984 that LeBron went to the police and informed them that she actually had seen Perez and the likely perpetrators shortly before the crime. She ultimately decided to come forward with her full story because she had received threats against her son's life. The police showed LeBron several books of photographs; she identified Mario Flores, Victor Flores, and Samuel Ramos as the three men she had seen with the victim shortly before his death.

The police arrested Ramos and took him into custody for questioning. Ramos provided the police with information that implicated Victor and Mario Flores as well as the petitioner, Mr. Gomez. The police then located Victor and Mario Flores and arrested them; they were driving an automobile with the license number AA 959. LeBron subsequently viewed a lineup in which Victor and Mario Flores and Samuel Ramos were present. LeBron positively identified Victor and Mario Flores, but determined that Ramos was not the third man she had seen with the victim before his death. Soon thereafter LeBron was shown photographs from which she identified Mr. Gomez as the third person at the accident scene.[2]

At Mr. Gomez's state court trial for the murder and armed robbery of Perez, Nancy LeBron related the events that she saw take place shortly before Perez's death. At approximately 2:30 a.m. on January 1, 1984, LeBron was sleeping at her home at 2351 West North Avenue when she was awakened by the sounds of an automobile accident. She looked out her window and saw that a car in which Perez was riding had crashed into a light pole. Two other cars then stopped near the accident; Mario and Victor Flores and Mr. Gomez emerged from them. LeBron testified that she saw Mario Flores remove a shotgun from the trunk of one of the cars and, after he spoke with Mr. Gomez, return the shotgun to the trunk. She then saw Perez enter one of the cars with Mario Flores and saw both cars leave the scene.

Samuel Ramos was also called by the State of Illinois to testify at Mr. Gomez's trial. Ramos, who was serving a sentence for an unrelated conviction for armed robbery and murder, basically refused to testify; he claimed that he could· remember nothing about the events of the morning of January 1, 1984. However, the prosecution called Ramos' attention to his grand jury testimony in the Gomez case, which was later entered into the record as substantive evidence. In his grand jury testimony, Ramos had related that Mr. Gomez spoke with him on January 2, 1984 and boasted that Mario Flores had killed someone. Ramos had stated that Mr. Gomez told him that a car accident had taken place at the corner of North Avenue and Western Avenue involving Perez and a woman. Perez's yelling at the woman apparently had angered Mario Flores, who went to his trunk to get a shotgun. Mr. Gomez had told Mario Flores to put the shotgun back, and then had run back to Perez and had persuaded him to come with them in their car. Perez had gotten in the car and had driven to an alley just off St. Paul Avenue, where Mario Flores had shot Perez and Mr. Gomez had taken his jewelry.

Victor Flores also was called to the stand by the prosecution. He testified that, around 2:00 a.m. on January 1, 1984, he was riding in a car driven by Mario Flores. A car proceeding at a high speed passed them as they were driving along North Avenue. When they later came to the corner of North Avenue and Western Avenue, they saw that the car that had passed them had been involved in an accident. They decided to stop, as did Mr. Gomez, who was driving along with them in another car. Victor Flores then testified to the same events to which Samuel Ramos testified in his grand jury testimony—Perez's yelling at the woman involved in the accident, Mario Flores' going for his shotgun, etc.

Unlike Ramos' grand jury testimony, however, Victor Flores' trial testimony took the story up to the time and place of the crime. Victor Flores drove Mario Flores and Perez from the scene of the accident to an alley off St. Paul Avenue. There he parked next to

**2.** The constitutionality of these identification procedures, while raised in the state appellate court, were not raised in this federal habeas proceeding.

Mr. Gomez, who already had arrived. Mario Flores and Perez exited the car. Victor Flores testified that as he was driving the car in reverse in order to turn the car around, he heard four or more gunshots. He looked in his rear-view mirror and saw Perez on the ground. Mario Flores was standing above Perez and was holding a shotgun; Mr. Gomez was bending over Perez's upper body. Victor Flores testified that Mr. Gomez later showed him the handful of chains he had removed from Perez's body.

In his defense, Mr. Gomez offered no evidence. The jury convicted him of armed robbery and murder, and he was sentenced to forty-years' imprisonment. The trial court, after conducting a hearing on the relevant issues, denied Mr. Gomez's motion for a new trial. The Illinois appellate court affirmed the conviction in an unpublished opinion, and the Illinois Supreme Court denied a petition for leave to appeal. Mr. Gomez then filed a petition for a writ of habeas corpus in the district court under 28 U.S.C. § 2254. He asserted a variety of constitutional errors in the state court proceedings. The district court, however, denied Mr. Gomez's petition. The district court also refused to hold an evidentiary hearing on whether his waiver of conflict-free counsel was knowing and intelligent, and on whether he received effective assistance of counsel.

## II

## DISCUSSION

Mr. Gomez raises several issues on appeal. First, he submits that his trial counsel's cross-examination of Samuel Ramos deprived him of his Sixth Amendment right to effective assistance of counsel. He also asserts that the district court erred in not holding an evidentiary hearing to determine whether his waiver of conflict-free defense counsel was knowing and intelligent. Second, he claims that his Fifth Amendment right not to testify and his Sixth Amendment right to confrontation of witnesses were violated by the prosecution's comment in closing argument on Mr. Gomez's nontestimonial courtroom behavior. Third, Mr. Gomez alleges that several aspects of his trial denied him due process of

law: He asserts that the prosecution withheld evidence about its decision not to prosecute a key prosecution witness; that a prosecution witness impermissibly commented on anonymous threats she received about the case; and that photographs admitted into evidence deprived him of a fair trial. We shall address each issue seriatim.

A. *Ineffective Assistance and Conflict of Interest Claims*

1.

Mr. Gomez argues that his trial counsel's failure to cross-examine Samuel Ramos effectively constituted a violation of his Sixth Amendment right to effective assistance of counsel. Ramos had testified extensively before the grand jury about Mr. Gomez's role in the Perez homicide. He claimed not to remember any of that testimony at trial, only to be reminded of it by the prosecutor, who read a great deal of it back to Ramos on direct examination; Ramos' grand jury testimony eventually was entered into the record as substantive evidence. The entire cross-examination of Ramos by Mr. Gomez's trial counsel consisted of the following:

Q: Mr. Ramos, in November when you were brought to the police station, November of 1984, they brought you to the police station regarding a homicide, didn't they?

A: Yes, they said I was being charged with a homicide. They just took me in for questioning.

Q: And before you testified today, were you given immunity by the State that you could not be prosecuted in this case for that homicide?

A: I can't understand really what you're saying.

. . . .

Q: (Continuing by Mr. Johnson) Mr. Ramos, a paper was signed by Judge Bailey granting you immunity saying you could not be prosecuted for this homicide, isn't that correct?

A: Yes.

Tr. 149, 152–53. On recross-examination, Mr. Gomez's trial counsel asked Ramos one question:

Q: And that immunity was that you could not be prosecuted for the homicide of Gilbert Perez, isn't that correct?

A: Right.

Tr. 155. Mr. Gomez claims that there were substantial areas about which any reasonably competent attorney would have questioned Ramos. Mr. Gomez contends, for instance, that Ramos should have been questioned about his motive to avoid being charged with the Perez homicide by placing the blame on Mr. Gomez; about his desire not to have his bond revoked in an unrelated case pending at that time; and about Ramos' expectations concerning potential prosecutorial benefits his cooperation could bring him in the unrelated criminal proceeding against him. Further, Mr. Gomez states that his trial counsel never exploited Ramos' obvious credibility problems in light of his feigned memory loss on direct examination at trial.

Mr. Gomez's arguments about his trial counsel's allegedly deficient cross-examination of Ramos, however, cannot be understood fully without setting forth Mr. Gomez's conflict of interest claim. The alleged conflict arose out of the fact that Mr. Gomez's trial counsel, Michael Johnson, and one of his associates previously had represented prosecution witness Samuel Ramos. Mr. Gomez acknowledges that Johnson and the state trial court alerted him to the fact that Johnson had represented Ramos in unrelated criminal proceedings. Moreover, he concedes that he agreed to a waiver of conflict-free counsel with at least some knowledge that Johnson previously had been Ramos' attorney. He now asserts, however, that his waiver was not knowing and intelligent because he was not apprised of the full extent of Johnson's previous representation of Ramos. Mr. Gomez claims that he was not informed that Johnson represented Ramos at the very time Ramos gave testimony to a grand jury seriously inculpating Mr. Gomez in the Perez homicide. Mr. Gomez argues that, but for Johnson's prior representation of Ramos at the time he testified before the grand jury, Johnson would have cross-examined Ramos far more extensively about his detrimental grand jury testimony.

Mr. Gomez contends that a side-bar colloquy between Johnson and the prosecution evidences that the full extent of Johnson's previous representation of Ramos was never disclosed to him. After Johnson had asked only two questions in his cross-examination of Ramos, the prosecution asked for a side-bar discussion concerning the scope of Ramos' grant of immunity in the Perez homicide case. Tr. 149. In the course of the discussion, the prosecution threatened Johnson with bringing out his prior representation of Ramos if his cross-examination went too far into the matter of Ramos' immunity:

If he goes into this, I am going to go into the issue that he is his lawyer. Being his lawyer has a lot to do with this.

Tr. 150. The prosecution was referring to the fact that Johnson ("he") had previously been Ramos' ("his") lawyer. Following this exchange, Mr. Gomez points out, Johnson asked Ramos only one question before ending the cross-examination—whether Ramos had received immunity in the Perez homicide. Tr. 152–53. Furthermore, Mr. Gomez states that the state trial court apparently directed the matter of Johnson's handling of the conflict issue to the Illinois Attorney Registration and Disciplinary Commission. Tr. 405–07. Mr. Gomez claims that this referral constitutes further evidence that Mr. Gomez may well never have known the full extent of Johnson's previous representation of Ramos. He therefore submits that the record as it stands does not demonstrate that his waiver of his right to conflict-free counsel was knowing and intelligent. *See Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970); *United States v. Flores,* 5 F.3d 1070, 1078 (7th Cir. 1993), *cert. denied,* — U.S. ——, 114 S.Ct. 884, 127 L.Ed.2d 79 (1994).

The respondents, in turn, maintain that, before obtaining any relief for a conflict of interest under *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), Mr. Gomez must "show that his counsel actively represented conflicting interests"; otherwise "he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* at 350, 100 S.Ct. at 1719. Mr. Gomez, the respondents submit, has nev-

er demonstrated such a conflict. Nor has he demonstrated the resulting adverse impact on performance that *Cuyler* requires even if a conflict was present. *See id.* at 348, 100 S.Ct. at 1718. Moreover, regardless of whether Mr. Gomez has shown a conflict that adversely affected his trial counsel's performance, he waived any conflict his trial counsel may have had arising out of his previous representation of Ramos. The respondents state that, after a thorough questioning of Attorney Johnson, the state trial court informed Mr. Gomez on two separate occasions about Johnson's prior representation of Ramos. The trial court also made clear to Mr. Gomez the nature of a conflict as well as the possible adverse effects a conflict could have on his counsel's performance; in doing so, the court made express reference to potential inhibitions Johnson might experience in cross-examining Ramos.[3] On both occasions, Mr. Gomez indicated that he wished to proceed with Johnson as his counsel, thereby waiving any conflict Johnson had stemming from his prior representation of Ramos. Moreover, the respondents argue that this waiver was knowing and intelligent. Indeed, the respondents state that, under 28 U.S.C. § 2254(d), this court must show deference to the Illinois appellate court's conclusion that Mr. Gomez "knowingly and intelligently waived his right to conflict-free representation." *People v. Gomez*, No. 1–87–1858, slip op. at 8 [178 Ill.App.3d 1158, 141 Ill.Dec. 649, 551 N.E.2d 836 (table)] (1st Dist. Jan. 25, 1989); *see also* 28 U.S.C. § 2254(d) (stating that state court factual findings in habeas proceedings "shall be presumed to be correct"). As a result, the respondents submit that Mr. Gomez cannot now attack his conviction collaterally on the basis that he was adversely affected by his lawyer's conflict.

### 2.

We begin our analysis by noting the well-established proposition that a defendant may waive the right to counsel free from conflict of interest. *Holloway v. Arkansas*, 435 U.S. 475, 483 n. 5, 98 S.Ct. 1173, 1178 n. 5, 55 L.Ed.2d 426 (1978); *United States v. Lowry*, 971 F.2d 55, 60 (7th Cir.1992); *United States v. Beniach*, 825 F.2d 1207, 1210 (7th Cir.1987). Because such a waiver is a waiver of a constitutional right, however, it must be knowing and intelligent; thus, the waiver must be made "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970); *see also Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938) ("The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."). Such an awareness allows a court to accept a defendant's waiver because the defendant likely "understands the kinds of risks involved and has a reason for making his choice." *United States v. Roth*, 860 F.2d 1382, 1388 (7th Cir.1988), *cert. denied*, 490 U.S. 1080, 109 S.Ct. 2099, 104 L.Ed.2d 661 (1989). In short, then, the defendant must

---

**3.** Prior to trial, the state trial court questioned Attorney Johnson in the presence of Mr. Gomez about his prior representation of Ramos; it then questioned Mr. Gomez as follows:

> THE COURT: Mr. Gomez, you understand you are entitled to a lawyer who has no divided loyalties whatsoever, do you understand that?
> THE DEFENDANT: Yes, sir.
> THE COURT: It could be that during the course of cross-examination of Mr. Ramos that counsel may feel because he has represented him before, some inhibition about cross-examining him as vigorously as he might otherwise do. Do you understand that?
> THE DEFENDANT: Yes, Judge.
> THE COURT: Knowing that is it your desire to have counsel continue to represent you?
> THE DEFENDANT: Yes, sir.
> THE COURT: That is your desire?

> THE DEFENDANT: Yes, sir.
> Tr. 5. The court later questioned Mr. Gomez again about his waiver of conflict-free defense counsel:
> THE COURT: Mr. Gomez, recently or within the past month or two, I spoke to you about information that had come to my attention about the fact that your lawyer, Mr. Johnson, represented a man by the name of Ramos, Samuel Ramos, that Sammy Ramos is a potential State witness or has been a substantial witness in this case, do you recall that?
> THE DEFENDANT: Yes, sir.
> THE COURT: At that time you indicated that that fact, notwithstanding, you still wished to proceed with Mr. Johnson as your lawyer, is that correct?
> THE DEFENDANT: Yes, sir.
> Tr. 14.

have enough information about the conflict and its potential effects from which to make a rational choice "with eyes open." *Beniach,* 825 F.2d at 1210 (citing *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975)); *see also Lowry,* 971 F.2d at 61. Yet we have recognized that there are practical limits concerning how much information a court can give a defendant regarding a waiver:

> The right question . . . is not whether the judge told the defendant everything. No choice of any kind is made with perfect information, and hindsight always turns up some additional snippet. The question is whether the defendant knew enough to make the choice an informed one—a rational reconciliation of risks and gains that are on the main understood.

*Roth,* 860 F.2d at 1387–88.

■ In this habeas proceeding, however, it is not our task to determine de novo whether Mr. Gomez's waiver was knowing and intelligent. Under 28 U.S.C. § 2254(d), federal courts are to presume in habeas proceedings that state court factual findings are correct if the findings are made after a hearing on the merits and are fairly supported by the record. *Cuppett v. Duckworth,* 8 F.3d 1132, 1141 (7th Cir.1993) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 1226, 127 L.Ed.2d 571 (1994). In *Perri v. Director, Department of Corrections,* 817 F.2d 448, 450 (7th Cir.), *cert. denied,* 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987), we addressed the question of whether § 2254(d) applies to the validity of a waiver. We determined that "the question of knowing and intelligent waiver does not require the application of legal principles," but rather "is a factual question, because whether an individ-

ual understood his or her rights is an inquiry into his or her state of mind." *Id.* at 451. We held, therefore, that "findings of a state court on questions of whether a defendant understood his or her rights and knowingly and intelligently waived them are entitled to the § 2254(d) presumption." *Id.; see also Cain v. Peters,* 972 F.2d 748, 749 (7th Cir. 1992) ("'Waiver' in criminal law is a fact-specific concept, to which the presumption of correctness in 28 U.S.C. § 2254(d) applies."), *cert. denied,* —— U.S. ——, 113 S.Ct. 1310, 122 L.Ed.2d 698 (1993); *Bobo v. Kolb,* 969 F.2d 391, 397 (7th Cir.1992) (same); *Sotelo v. Indiana State Prison,* 850 F.2d 1244, 1247 n. 6 (7th Cir.1988) (same). *But see United States v. Yunis,* 859 F.2d 953, 958 (D.C.Cir. 1988) (expressing in dicta disagreement with *Perri*). Although *Perri* dealt with waivers in the context of *Miranda* rights, we have recognized the logical extension of *Perri* to waivers of conflict-free counsel in *Lewis v. Huch,* 964 F.2d 670, 674 (7th Cir.1992).[4]

■ We therefore agree with the respondents that § 2254(d) applies to the Illinois appellate court's finding that Mr. Gomez has "knowingly and intelligently waived his right to conflict-free representation," *People v. Gomez,* [178 Ill.App.3d 1158, 141 Ill.Dec. 649, 551 N.E.2d 836 (table) ] No. 1–87–1858, slip op. at 8 (1st Dist. Jan. 25, 1989). *See Cain,* 972 F.2d at 749 (stating that "§ 2254(d) is no less applicable to findings by appellate courts than to findings by trial courts"); *Bobo,* 969 F.2d at 391 (same). Besides Mr. Gomez's conclusory and erroneous assertion that a waiver is an issue of law, the only argument we can construe him to make with respect to § 2254(d) is that there was a material fact of

---

4. In *Lewis,* we noted that *Perri* had acknowledged that prior cases such as *United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431 (7th Cir.1983), had found § 2254(d) not to apply to the issue of whether a waiver was knowing and intelligent. Nonetheless, in the course of "re-evaluating" decisions like *Tonaldi, Perri* held the presumption to apply. Because *Tonaldi* had dealt with the express issue of whether § 2254(d) applies to the validity of a waiver of conflict-free counsel, we extended § 2254(d)'s applicability to the validity of conflict-free waivers in *Lewis:* "The explicit reference to *Tonaldi* as an example of the 'previous decision' being re-evaluated demonstrates that in *Perri* we rejected the *Tonaldi* holding that

whether a defendant waived his right to conflict-free counsel was a question of law and not fact." *Lewis,* 964 F.2d at 674.

We also rejected in *Lewis* dicta found in *United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1018 (7th Cir.1987), listing the validity of a waiver as an example of a mixed question of law and fact to which § 2254(d) does not apply. Further, we noted that *United States ex rel. Duncan v. Leary,* 806 F.2d 1307, 1315 (7th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987), which stated that "the determination of the validity of petitioner's waiver is not a purely factual question, but is rather a mixed question of law and fact," had been decided prior to *Perri.*

which neither he nor the trial court was aware at the time he agreed to waive his right to conflict-free counsel—namely, that Attorney Johnson had represented Ramos at the time Ramos appeared before the grand jury. He urges us to remand the case to the district court for an evidentiary hearing on this matter. This is essentially an argument that the state court's findings are not fairly supported by the record as required under § 2254(d)—an argument we cannot accept in this case. *Cf. Milone v. Camp*, 22 F.3d 693, 699 (7th Cir.1994) (stating that this court "may not revisit Illinois fact-finding absent a showing ... that error of the type described in 28 U.S.C. § 2254(d) infected the state court proceedings").

In determining the validity of Mr. Gomez's waiver, both the state trial court and the state appellate court were aware that Johnson had represented Ramos at the time Ramos testified before the grand jury about Mr. Gomez's role in the Perez homicide. At a hearing on Mr. Gomez's motion for a new trial, Mr. Gomez's new defense counsel called Johnson as a witness. Johnson testified that he had represented Ramos in unrelated criminal proceedings at the time Ramos testified before the grand jury. Tr. 349–50.[5] He also testified that, at the time, he had not known that Ramos had gone before the grand jury. After he found out about it several months later, he informed Mr. Gomez that he had represented Ramos during the time period Ramos informed the grand jury about Mr. Gomez's role in the Perez murder. Tr. 353–54. Mr. Gomez, who also took the stand at the new trial hearing, did not testify otherwise. Tr. 373–78. Indeed, the Illinois appellate court specifically noted the defendant's testimony at the new trial hearing in determining that he had knowingly and intelligently waived his right to conflict-free representation. *See* R.26 at 8.

In short, there were no material facts pertaining to Mr. Gomez's waiver of conflict-free counsel about which he—or the state courts assessing his waiver—did not know. Mr. Gomez was, rather, sufficiently apprised of the relevant circumstances to make a rational choice about whether to waive his Sixth Amendment rights, just as the caselaw requires. We thus conclude that the state court's finding that Mr. Gomez knowingly and intelligently waived his right to conflict-free counsel is fairly supported by the record and is therefore entitled to a presumption of correctness under § 2254(d). *See Lewis v. Huch*, 964 F.2d 670, 675 (7th Cir.1992).

Moreover, Mr. Gomez cannot now be heard to complain that the conflict he waived resulted in ineffective assistance of counsel. "The law on this point is clear. A defendant who knowingly and intelligently waives his attorney's potential or actual conflict of interest may not, under any circumstances, later claim that such a conflict deprived him of his

---

**5.** Johnson was called to testify at the new trial hearing by Mr. Gomez. On direct examination, he testified as follows:

Q: Were you in fact representing [Ramos] at the time that he was initially questioned and gave a statement against Mr. Gomez?
A: You mean at trial?
Q: No. Were you representing Mr. Ramos at the time Mr. Ramos initially gave a statement to the authorities accusing Mr. Gomez?
A: I did.
Q: What were you representing Ramos for at that time?
A: I was on trial representing, actually Mr. Ramos' co-defendant. My associate represented Mr. Ramos. I believe it was an armed robbery-aggravated battery case before Judge DiVito.
....
Q: And after [Ramos] was accused of the homicide he then said, "Well it is not me. It was Mr. Gomez and some other people"?
A: He accused Mr. Gomez and other people.

Q: And went before the Grand Jury?
A: He did.
Q: And then he was released from custody?
A: He was.
Q: Did all this occur while the jury trial before Judge DiVito was in process?
A: It was over the weekend during a break, yes.
Q: Did you ever tell that information to Mr. Gomez?
A: I didn't know it until some five, six months later.
Q: Five, six months later than what?
A: After he went to the Grand Jury.
Q: Did you tell that information to Mr. Gomez when you were representing Mr. Gomez?
A: Oh, yes.
Q: You told Mr. Gomez that Ramos, you gave him all those details?
A: I told him when Ramos went to the Grand Jury it was during the week when he was away actually on trial before Judge DiVito.
Tr. 349–50, 353–54.

**1136**

right to effective assistance of counsel." *Harvey v. McCaughtry,* 11 F.3d 691, 695 (7th Cir.1993); *see also United States v. Lowry,* 971 F.2d 55, 63 (7th Cir.1992) (stating that "a valid waiver of the right to conflict-free counsel bars any later claim of ineffective assistance growing from that conflict"); *United States v. Beniach,* 825 F.2d 1207, 1211 (7th Cir.1987) ("Having made such a waiver, the defendant will not now be heard to complain of a conflict."). Although Mr. Gomez's waiver does not preclude him from asserting every possible ineffective assistance of counsel claim, his waiver does bar an ineffective assistance claim arising from the alleged conflict itself.

■ Here, Mr. Gomez does not attribute the caliber of cross-examination of Ramos to any specific cause other than the assumed conflict of interest of his attorney—a conflict of interest that he has waived. If we were to assume that this cross-examination could be evaluated without reference to the waiver of counsel's conflict of interest, we do not believe that counsel's performance was so deficient as to run afoul of the test established in *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) ("When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."). Counsel adequately elicited testimony from Ramos that revealed that Ramos possibly was involved in the murder of Perez and, as a result of his grant of immunity, had a motive to testify against Mr. Gomez.

**B.** *Comment on Mr. Gomez's Courtroom Behavior*

■ Mr. Gomez also argues that the prosecution's comment during closing argument on his nontestimonial behavior during the trial violated his Fifth Amendment right not to testify and his Sixth Amendment rights to assistance of counsel and to confrontation of witnesses. The comment at issue concerned Mr. Gomez's purported courtroom behavior at the time the prosecution asked Nancy LeBron to identify him:

I want you to think about Nancy LeBron on the witness stand. When Bill [ (cocounsel) ] was up there and said well which one is it. The guy with the glasses or the guy without the glasses. And a lot of you saw what [Mr. Gomez] did. Took them right off. Like that.

Tr. 304. The respondents argue that a reasonable jury would not "naturally and necessarily" construe the statement as a comment on Mr. Gomez's failure to testify. *See United States v. Muscarella,* 585 F.2d 242, 249 (7th Cir.1978) (stating that we review such a statement "to determine whether it was manifestly intended to be or was of such a character that the jury naturally and necessarily took it to be a comment on [the defendant's] failure to testify"); *see also United States v. Brown,* 688 F.2d 1112, 1117–18 (7th Cir.1982) (same). This is evidenced, they argue, by the fact that Mr. Gomez's defense counsel failed even to object at the time the statement was made. Instead, the respondents claim that the statement was only a reference to Nancy LeBron's credibility. In any event, the respondents submit that any error was harmless in light of the evidence presented against Mr. Gomez at trial.

We agree with the respondents that the jury likely did not "naturally and necessarily" take the statement at issue to be a comment on Mr. Gomez's failure to take the stand. *Cf. United States v. Schuler,* 813 F.2d 978, 981 (9th Cir.1987) ("[W]e doubt that jurors would construe the prosecutor's comment on [the defendant's] laughter as referring to his failure to testify."). There are, however, other rights in play when such a statement is made. The prosecution may not, consistent with a defendant's due process rights and Sixth Amendment right to confrontation, "seek to obtain a conviction by going beyond the evidence before the jury." *United States v. Vera,* 701 F.2d 1349, 1361 (11th Cir.1983). There is caselaw authority that holds that a defendant's nontestimonial courtroom behavior is not evidence subject to comment. *See United States v. Wright,* 489 F.2d 1181, 1186 (D.C.Cir.1973).

In such a case, the defendant has not had a fair opportunity to introduce evidence supporting an inference to the contrary to the

one being supported by the prosecutor, and the jury is being asked to accept the word of the prosecutor about conduct to which its attention was not called during trial. Moreover, the defendant's Sixth Amendment right to confront adverse witnesses is violated in such a case because there has been no opportunity for the defendant to cross-examine the prosecutor. *United States v. Gatto,* 995 F.2d 449, 455 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 391, 126 L.Ed.2d 339 (1993); *see also United States v. Pearson,* 746 F.2d 787, 796 (11th Cir.1984) (holding that prosecutor's comment in closing argument—that the defendant's leg movement during trial demonstrated his nervousness and fear—constituted constitutional error); *United States v. Carroll,* 678 F.2d 1208, 1209 (4th Cir.1982) (holding that prosecutor's reference to the defendant's courtroom behavior constituted constitutional error).

In this case, however, we need not decide whether the prosecutor's comment on Mr. Gomez's courtroom behavior violated Mr. Gomez's right to confrontation and his right not to be convicted except on the basis of the evidence admitted at trial. Even if we assume *arguendo* that the prosecutor's comment was improper, we cannot say that it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahmson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *Quinn v. Neal,* 998 F.2d 526, 530 (7th Cir.1993). The prosecution presented the testimony of three individuals who directly implicated Mr. Gomez in the Perez murder: one who witnessed the murder; one who was informed by Mr. Gomez himself that he had taken part in the crime; and one who saw Mr. Gomez with the victim moments before the crime. The prosecutor's improper remarks cannot be said to have caused "actu-

al prejudice" in light of the evidence presented against Mr. Gomez at trial. *See Brecht,* —— U.S. at ——, 113 S.Ct. at 1722 (stating that "substantial and injurious effect or influence" standard requires a habeas petitioner to demonstrate "actual prejudice" in order to obtain relief).

### C. *Denial of Due Process Claims*

#### 1.

█ Mr. Gomez submits that the prosecution withheld evidence of benefits it gave to one of its witnesses for testifying against him at trial, thus denying him due process of law. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (holding that the prosecution's suppression of material evidence favorable to the defendant upon request violates due process); *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) (rejecting any distinction between impeachment evidence and exculpatory evidence for *Brady* purposes). Victor Flores, a key prosecution witness who gave a first-hand account of Mr. Gomez's role in the Perez homicide, testified at trial that he had not been promised any benefits by the prosecution. Tr. 222. Moreover, the prosecution affirmatively told the jury in closing that, although Victor Flores had a motive to lie, he was still being charged with Perez's murder. Tr. 271–72.[6] Mr. Gomez argues that, because the prosecutors "knew of their intent to drop charges against Victor Flores" when they told the jury otherwise, they misled the jury on a vital issue in violation of due process. *See* Appellant's Br. at 35. He contends, without authority, that we must remand this case to the district court for an evidentiary hearing in which the prosecution must prove that the decision to drop the charges against Victor Flores was made after the prosecution's remarks on the subject at closing argument. The respondents, in turn, simply argue that the prosecution's representation at trial on November 3,

---

6. In closing, the prosecution stated:
   Ladies and gentlemen, you also heard from Victor Flores. Now Victor has a motive to lie. Victor is charged with murder. He's still charged with this case. And I don't want you people to go back there worrying about what's happening to Victor Flores. Because no of-

   fense, but at this time it's none of your business. It's not before you. The only thing you're to worry about is the defendant. Victor Flores will have his time in court and he can worry about that. I can worry about that. It's not for you to worry about.
   Tr. 271–72.

1986—that Victor Flores was charged with murder—was entirely accurate. They state that the decision to drop the charges against Victor Flores was not finalized until December 30, 1986, and that Mr. Gomez has no evidence whatsoever to the contrary.

We cannot accept Mr. Gomez's argument. In *People v. Harris,* 55 Ill.2d 15, 302 N.E.2d 1 (1973), a defendant seeking post-conviction relief made the same claim Mr. Gomez makes in this case, except that in *Harris* the prosecution had moved for a *nolle prosequi* for a key prosecution witness only five days after the defendant's conviction. The court stated that, because the defendant had offered no proof demonstrating that the witnesses had been offered any benefits for their testimony, or that the prosecution had in fact decided to drop charges against the witnesses at the time they testified, no relief could be granted:

> The fact that the charges against the two witnesses were dropped five days after the defendant's conviction might lead to speculation that the State had intended to drop the charges against the witnesses if they testified. However, such circumstances could just as readily lead to a conjecture that this decision was only considered, and made, after the successful prosecution of the defendant.

*Id.* at 3. Although we are aware that a *Brady* claim is one of federal constitutional dimension, we believe that the reasoning of the Illinois Supreme Court in *Harris* is sound. The respondents have stated that the representations made in the trial court concerning the charges against Victor Flores were accurate and were made in good faith. Without any allegation of the existence of evidence to the contrary, no evidentiary hearing is required. *Cf. People v. Steadman,* 82 N.Y.2d 1, 603 N.Y.S.2d 382, 623 N.E.2d 509 (1993) (holding that direct evidence that prosecution had, contrary to witness's testimony, made a leniency deal with witness's attorney amounted to a *Brady* violation despite witness's unawareness of the deal).

### 2.

■ Mr. Gomez next contends that his due process rights were violated by state-

ments prosecution witness Nancy Lebron made about the timing in her decision to inform the police about what she had seen the morning of the Perez homicide. Although she had some brief contact with the Chicago police shortly after the homicide in January 1984, Nancy Lebron did not come forward with full information about the homicide until November of that year. At trial, she testified on direct examination about the delay and her ultimate decision to come forward:

Q: Why did you not tell Detective Guevera the first time?

A: Because it's a dangerous case and I had children.

Q: Now, ma'am, directing your attention to the early part of November, 1984, did you call Detective Guevera?

A: Yes.

Q: And would you explain to the ladies and gentlemen of the Jury why you decided to call Detective Guevera?

A: I decided to call Detective Guevera because they wanted to kill my son. ,

MR. JOHNSON: Objection, Judge. Who is they?

THE WITNESS: They said it was him.

Q: (Continuing by [prosecutor]) Had you received some threats from someone about your son?

A: Yes. A lot of them. All the year.

Q: That was not from the Defendant, though, were they?

A: I don't know who they were from, but I got them.

Tr. 106–07. Mr. Gomez's attorney failed to make any further objection other than the one noted above. Mr. Gomez now submits on appeal that our decision in *Dudley v. Duckworth,* 854 F.2d 967 (7th Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989), demonstrates that Le-Bron's testimony violated his due process right to a fair trial and requires that we grant habeas relief. The respondents' only argument to the contrary is that the petitioner cannot now raise this issue because of his failure either to exhaust his state court remedies or to present the issue to the state court in a federal constitutional posture. *See Ver-*

din v. O'Leary, 972 F.2d 1467, 1472–76 (7th Cir.1992) (discussing principles of the fair presentation requirement). Because the record on appeal shows otherwise, see R.26, we shall address the merits of Mr. Gomez's argument.

In Dudley, the prosecution questioned one of its witnesses on direct examination about "how he felt about testifying." Dudley, 854 F.2d at 969. The witness stated that he was nervous and, after more prompting from the prosecutor, stated that he had received threatening phone calls the night before. The prosecutor continued to pursue the subject, asking the witness whether he feared for his girlfriend or aunt if he testified. The witness answered that he was fearful and, at the prosecutor's behest, explained his fear more fully. Defense counsel objected, but to no avail. Although the Indiana state courts found no error in this line of questioning, we held on habeas review that it amounted to a denial of fundamental fairness in violation of the defendant's due process rights. Id. at 972. We stated that the record suggested "the strong possibility that the prosecutor intended to get the threat testimony before the jury under a pretext," id. at 971—that the prosecutor "intended more to prejudice the defendant[ ] . . . than to explain away any nervousness of the witness," id. at 972. We thus concluded that the "prejudicial effect of the testimony . . . weighed against its necessity" mandated habeas relief. Id.

Although Mr. Gomez submits that Dudley's similarity to the facts in his case requires that we grant the writ, we believe that Dudley is distinguishable for two reasons. First, our holding in Dudley was based in large part on the fact that the introduction of the threats was pretextual; there was no need to introduce the threats other than to prejudice the defendant. In contrast, the need to apprise the jury of the anonymous threats to Nancy LeBron was far from pretextual. She had waited over ten months to come forward with her critical eyewitness information about the Perez homicide. The prosecution reasonably could assume that her delay in coming forward would hurt her credibility in the jury's eyes and therefore felt the need to have her briefly explain the reason behind her delay. More important, this fact was not lost on Mr. Gomez's defense counsel. Although he did not dwell on the point, he made reference in his closing argument to Nancy LeBron's delay. Tr. 281.[7] Second, Dudley engaged in a harmless-error analysis and found the admission of the evidence at issue not to be harmless. However, we stated in Thompkins v. Cohen, 965 F.2d 330, 333–34 (7th Cir.1992), that Dudley undertook that analysis unnecessarily because general harmless-error analysis does not come into play when the only federal right at issue is the general right to a fair trial. Instead, "to prevail on this ground a defendant must show that the errors or irregularities of which he complains probably caused a miscarriage of justice, that is, the conviction of an innocent person." Id. at 333. In Mr. Gomez's case, we cannot say that the evidence concerning the anonymous threats likely caused such a miscarriage of justice.

**3.**

Finally, Mr. Gomez submits that the admission of several "gruesome" photographs of Perez's body at the scene of the homicide deprived him of a fair trial in violation of due process. The photographs are of Perez's body as it was found the morning of January 1, 1984; they show the gunshot wounds from which he died. R.34. The respondents state in conclusory fashion that the photographs were admitted properly because they were corroborative of testimonial evidence and were probative of the circumstances of Perez's death. However, neither the fact of Perez's death nor the cause of his death were at issue in Mr. Gomez's trial. Thus, as in Ferrier v. Duckworth, 902 F.2d 545, 548 (7th Cir.), cert. denied, 498 U.S. 988, 111 S.Ct. 526, 112 L.Ed.2d 536 (1990), we believe the "only conceivable reason for placing them in evidence was to inflame the jury

---

7. Even in this appeal Mr. Gomez's counsel continues to emphasize that Nancy LeBron's delay in coming forward with what she witnessed the morning of the Perez murder demonstrated her lack of credibility. See Appellant's Brief at 13 ("She failed to report what she knew until November 10, 1984, eleven months after the occurrence, January 1, 1984, at a time when her recollection of her observation could not be accurate.").

against [the defendant]." Nonetheless, we cannot say that any resulting prejudice amounted to the likelihood that an innocent person was convicted, which as we have stated is what a petitioner alleging a violation of a general right to a fair trial must demonstrate to obtain habeas relief. *See Thompkins,* 965 F.2d at 333; *Ferrier,* 902 F.2d at 548.

### Conclusion

For the foregoing reasons, we affirm the district court's denial of the petition.

AFFIRMED.