# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 03-1245, 03-1246, 03-1266, 03-1283 & 03-1586

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STEPHEN L. MAYES, RAPHAEL S. CLAYTON,
JAQUAN T. CLAYTON, PAUL T. MOORE,
and ELLIS JORDAN,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 01-CR-148—**J.P. Stadtmueller**, *Judge.*

———————

ARGUED APRIL 12, 2004—DECIDED JUNE 8, 2004

———————

Before DIANE P. WOOD, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* In this case, the government charged several defendants with running a 10-year drug distribution operation. Ellis Jordan and another defendant entered guilty pleas and five defendants went to trial. On appeal, we are concerned with two counts: count I, to which Jordan entered a guilty plea and under which defendants Stephen Mayes, Raphael Clayton, Jaquan Clayton, and Paul Moore were convicted of conspiring to distribute over 5

kilograms of cocaine and 50 grams of "crack" cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & 846, and count III, under which Jaquan Clayton was found guilty of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). The defendants raise a number of trial and sentencing issues.

When viewed, as it must be at this point in time, in the light most favorable to the government, the evidence shows that the activities of the conspirators began in the early 1990's. By 1991, Raphael Clayton (who we will refer to simply as "Raphael") and Jordan were dealing cocaine out of their home at 2123 North 45th Street in Milwaukee, Wisconsin. Raphael supplied at least 1 to 1½ ounces of cocaine nearly every day to a crack house run by a gambling associate of his, and he sold another associate at least 6 to 7 kilograms of cocaine. Raphael worked in this enterprise with Moore, Mayes, and Jaquan Clayton (we will call him "Jaquan" the rest of the way); he shared the proceeds with Jordan and fronted kilograms of cocaine to Moore.[1]

By the fall of 1993, Jaquan was delivering 4½-ounce quantities to a half-brother at least once a day. Apparently, sometimes the cocaine would not properly cook into crack; Raphael was the one who took responsibility for defective goods.

During this time, undercover police officers made three controlled buys of cocaine from the home on 45th Street. Also, executing a search warrant at the home in January 1991, officers found a gun and cocaine residue. Executing another warrant in March 1993, they recovered eight bags containing a total of 221 grams of cocaine, three handguns,

---

[1] As will become important later in our discussion of the sentencings of Paul Moore and Raphael Clayton, many of these defendants are related to one another. For example, Ellis Jordan is Raphael Clayton's father; Jaquan Clayton and Allesando Haynes are Raphael's cousins; and Paul Moore and Steven Mayes are cousins.

a "speed loader," a digital scale, Inositol, a scanner, and a book of police frequencies.

The defendants expanded their operation between 1995 and 1998. They began to transport drugs using cars outfitted with "trap" compartments. The traps were used to move up to 12 kilograms of cocaine and to hold $100,000 to $125,000 in cash. Not all of their cars had traps, however, and in March 1995, Raphael, Moore, and Jaquan were in a car without one when they were stopped by police for driving an automobile with an expired license plate. After they were stopped, Raphael got out of the car and began walking to the squad car. When he was at the front of the squad he reached behind his back, which made the officer fear he had a gun. The officer put the squad in reverse. Raphael fled on foot, and the other defendants sped away and then abandoned the car. In the abandoned car the officers found a loaded gun and 6 bags containing a total of 760 grams of cocaine. When the officers caught Raphael a short distance away from the site of the stop he had over $5,000 in his pocket.

Undeterred, the defendants continued to sell cocaine. Raphael, Moore, and Mayes delivered some 120 to 150 kilograms of cocaine to new customers Anthony Scott and Rodney Davis. Raphael and Moore sold cocaine to Allesando Haynes, who was also indicted in this case.

By 1996, however, Raphael and Moore pulled back from the day-to-day selling and began to focus on buying real estate. They also began to refer customers to other members of the conspiracy. The two continued to handle customer complaints. To settle one dispute, Moore helped Rodney Davis buy a home.

In 1997 and 1998, Mayes began to maintain his own customer base, using cocaine supplied to him by Paul Moore. Paying Christopher Moore to help him, Mayes was selling 4 to 5 kilograms per day. Christopher Moore, who later testified for the government, went with Mayes to Peoria,

Illinois, on a delivery; he helped Mayes break down a kilo which had been delivered by Raphael and Jordan; he rode along on other deliveries and was present when gunmen kidnapped Mayes. The kidnapper demanded $90,000. Mayes called Jordan to get the money and the gunmen drove to the Jordan home, then at 10739 West Keefe in Milwaukee. Amazingly, the police were called and, while investigating the kidnaping, they stopped a Grand Marquis going past the residence very slowly. In it they found a loaded pistol. A few weeks later, Raphael was stopped after leaving 10739 West Keefe. He was driving the same Grand Marquis and had a loaded handgun with him in the car.

By 1999 the conspiracy caught the full attention of law enforcement officers. They conducted garbage searches at 10739 West Keefe and found documents linking various defendants together and to the residence on Keefe Street. In March, officers executed a search warrant on the home. They found cocaine, $10,000 wrapped in plastic, an additional $1,182, and a bulletproof vest. In the garage they found two cars containing traps. In one trap they found 494 grams of cocaine, marijuana, a scale, and over $37,000. In another, they found a loaded 9mm pistol. Officers also searched an apartment leased by Raphael. There, they found a bulletproof vest and photos linking the conspirators. A few months after these searches, a federal agent made a controlled buy of 4½ ounces of cocaine from Jaquan for $3,000.

After he was indicted in August 2001, Paul Moore disappeared. Two months later he was arrested while refinancing properties at his attorney's office. During the arrest, he told a deputy United States marshal that if he had obtained the money he would "be gone."

As we said, the defendants before us either pled guilty or were convicted after a jury trial. In January 2003, the district court, Judge J.P. Stadtmueller, held a hearing re-

garding drug quantities for sentencing purposes and found that each of the defendants sold or could foresee the sale of over 340 kilograms of cocaine and 15 kilograms of crack cocaine. Raphael and Moore were found to have played leadership roles in the conspiracy, and Raphael and Jaquan and Paul Moore were found to have possessed firearms. Raphael, Moore, and Mayes (who had two prior drug felonies) were sentenced to life imprisonment. Jaquan received concurrent prison terms of 330 months on the conspiracy count and 240 months on the delivery count. Jordan, who as we said pled guilty, was sentenced to 180 months imprisonment for conspiracy. He was placed on supervised release for 5 years, during which time he was to be required to submit to drug and alcohol testing, to refrain from working in a tavern, and to abstain from alcohol consumption.

Raphael, Jaquan, Moore, and Mayes argue that they should be granted a new trial because the trial judge erred in allowing Christopher Moore to testify that an unknown caller threatened him and his family if he testified at trial. They claim that the admission of the testimony, over their vigorous objections, was error and was unfairly prejudicial. We review claims regarding the admission of evidence of threats for an abuse of discretion. *United States v. Thomas*, 86 F.3d 647 (7th Cir. 1996).

Christopher Moore was a cooperating witness who, in exchange for his testimony, obtained a promise from the government that he would not be indicted for his involvement in selling cocaine. He was asked to testify at the trial on a Wednesday. He did not show up that day. When he testified 2 days later, the government asked him why he had not shown up on Wednesday. His answer was, "Because my family was threatened." The government then asked, "How were they threatened?" Moore began, "Somebody called my house and told my wife if I show up and testify . . . ."; at that point objections were lodged. He was

allowed to continue and said "that somebody—they was going to kill me and my kids."

The defense moved for a mistrial based on Moore's statement. Although the questions appeared to be intended to explain why Moore had not shown up the day he was asked to appear, in defending against the mistrial motion the government argued that the testimony was necessary to explain why he was groggy and upset on the stand. Judge Stadtmueller found that although a "cold transcript" does not convey demeanor very well, "it was more than clear that [Moore] was under a great deal of stress and obviously for good reason." The judge noted that the government was "quite restrained" and had taken an "antiseptic approach" in presenting the testimony; in addition, the threat "was properly brought before the jury as explanation for the witness's demeanor and, in part, to explain the witness's inconsistencies."

Before us, the government points out that the testimony was at best only a 2-minute snippet from a 10-day trial and that no reference was made to the threats in closing arguments. The government also claims that Moore's demeanor needed to be explained. During his testimony he had to be asked to speak up and needed to be reminded to lift his head high enough to reach the microphone. Because he testified to having been addicted to crack cocaine, absent an explanation for his demeanor, the government argues, the jury could have thought his behavior was a result of drug use.

The issue, then, is whether under Federal Rule of Evidence 403 the danger of unfair prejudice from the evidence substantially outweighed its probative value. Evidence of anonymous threats is not per se inadmissible. It may be admissible when it is necessary to explain specific credibility issues. *Gomez v. Ahitow*, 29 F.3d 1128 (7th Cir. 1994). In *Thomas*, we discussed a number of relevant cases and concluded:

These cases indicate that trial courts must carefully consider the probative value of threat evidence that is to be admitted for the purpose of assessing the credibility of witnesses. Together *Dudley* and *Gomez* teach that threat evidence has extremely limited probative value towards credibility, unless the evidence bears directly on a specific credibility issue regarding the threatened witness. For example, threat evidence can be relevant to explain a witness' inconsistent statements, delays in testifying, or even courtroom demeanor indicating intimidation. *See, e.g., Gomez,* 29 F.3d at 1139; *Qamar,* 671 F.2d at 736 (holding threat evidence admissible under Rule 403 to explain demeanor of witness who testified almost inaudibly and visibly wanted to get off witness stand); *United States v. DeLillo,* 620 F.2d 939, 945-46 (2nd Cir.) (holding threat evidence admissible under Rule 403 to impeach witness), *cert. denied,* 449 U.S. 835, 101 S. Ct. 107, 108, 66 L.Ed.2d 41 (1980). In such situations, the evidence of threats is necessary to account for the specific behavior of a witness that, if unexplained, could damage a party's case.

86 F.3d at 654.

In the present case, the evidence obviously poses a threat of unfair prejudice, and its probative value is highly questionable. Moore's demeanor on the stand could have easily been explained as the usual nervousness of a witness. As to his appearing tired, he testified that he had just finished working third shift at his job. In fact, on redirect, he explained that during the preceding 48 hours he had not slept and had worked three full shifts. The fact that he testified on Friday, rather than Wednesday, could be explained any number of ways. Juggling witnesses is a normal trial event hardly requiring serious explanation. In short, it is hard to see much in the way of probative value to the testimony of threats. And so we conclude, on balance, that it was an abuse of discretion to admit Moore's threat testimony.

That does not end the inquiry, of course. In order to be the basis for the grant of a new trial, the admission of evidence must not have been harmless. We deem an error to be harmless unless it has a "'substantial and injurious effect or influence' on the jury's verdict." *United States v. Hanson*, 994 F.2d 403, 407 (7th Cir. 1993). In evaluating whether an error is harmless, we consider such things as the importance of the testimony, whether the evidence was cumulative, whether other evidence corroborated the witness, and the strength of the government's case. *United States v. Hernandez-Rivas*, 348 F.3d 595 (7th Cir. 2003).

The error here, we conclude, was clearly harmless. The testimony was very brief; it was not emphasized or highlighted. More importantly, the evidence of guilt was significant. Approximately 40 witnesses linked the defendants to each other and to the distribution of hundreds of kilograms of cocaine and large quantities of crack cocaine. The evidence shows a long-term operation that used tools of the trade, such as pagers and trap cars, to accomplish its goals. While it is true that a good deal of the testimony came from cooperating witnesses, it is for the jury to assess that testimony. And the testimony was corroborated by testimony from law enforcement personnel. There were controlled buys, evidence seized during the execution of search warrants, evidence obtained from traffic stops, items found in garbage searches, and property records, all of which lent credibility to the testimony. We cannot find that the very limited questioning about a threat had a substantial and injurious effect on the verdict or could possibly support the grant of a new trial.

Raphael also contends that it was an abuse of discretion to admit out-of-court statements by two informants that they could purchase cocaine from "Raphael" at 2123 North 45th Street. The evidence was admitted not for its truth but rather to explain why police officers took steps to make controlled buys and to execute search warrants at that

address. Raphael, however, contends that, even for that limited purpose, the reference to "Raphael" was hearsay, violated the Confrontation Clause, and was unfairly prejudicial.

The government concedes that the identification of "Raphael" was not necessary and should not have been admitted, but it argues that admission of the evidence was harmless. We agree. The references were brief. No limiting instruction was requested. The identifications were not referred to in closing arguments. More importantly, the evidence was cumulative. Finally, we note that the evidence of Raphael's involvement with the conspiracy was overwhelming. Other evidence was properly admitted about the controlled buys and the searches. Even without the references to "Raphael," the jury knew that Raphael Clayton was linked to the 45th Street house. He, in fact, did not dispute that he lived in the house but, rather, attempted to suggest that Ellis and Patricia Jordan, who also lived there, were the drug dealers. He cross-examined the officers to show that he was not present during the searches, that drugs were found in the Jordans' bedroom, and that both Ellis and Patricia Jordan were charged with drug offenses in state court. The admission of a reference to "Raphael" was harmless beyond a reasonable doubt. *See Chapman v. California*, **386** U.S. **18** (1967).

Paul Moore raises an issue regarding the sufficiency of the evidence to sustain the conspiracy verdict against him. When reviewing the sufficiency of the evidence, we consider the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the government. *United States v. Patterson*, **348** F.3d **218** (7th Cir. 2003). If, after viewing the evidence, any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the conviction will be affirmed. *Jackson v. Virginia*, **443** U.S. **307, 319** (1979).

To sustain the verdict of conspiracy to distribute cocaine, the government must have proven that the conspiracy existed and that Moore knowingly joined it with the intent to further its goals. *United States v. Albarran*, 233 F.3d 972 (7th Cir. 2000). Moore concentrates on the second requirement and claims that the proof was insufficient to show that he joined the conspiracy. He contends that the cooperating witnesses who put him in the conspiracy were all lying. The problem with that contention, of course, is that the jury, not appellate judges, determines issues of credibility. *United States v. Moninaro*, 877 F.2d 1341 (7th Cir. 1989). In addition, Judge Stadtmueller, who also heard the evidence, rejected Moore's claim. The judge named six witnesses who provided "telling evidence" against Moore. Their testimony, when coupled with testimony from law enforcement officials, put Moore in the thick of a conspiracy which dealt large amounts of cocaine. The evidence was sufficient to sustain the verdict against him.

We turn now to sentencing issues. Moore and Raphael contend that the district court erred in imposing 4-level increases to their offense levels for their role in the offense under U.S.S.G. §3B1.1(a). In particular, Moore says that the judge did not make the findings required under the application notes and did not adequately explain the reasons for the increase. Raphael claims the adjustment was improper because the evidence established nothing more than an association of equals.

U.S.S.G. §3B1.1(a) provides for a 4-level increase if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." The application notes set out factors which should be considered in distinguishing a leadership and organizational role from a role as a "mere" manager or supervisor. These include "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed

right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree or control and authority exercised over others."

The government argues that both Moore and Raphael exercised decision-making authority and exerted control over others. The evidentiary basis for this assertion, however, is less than compelling. The evidence is that Raphael, for instance, decided who would deliver cocaine and at what price. He is also the one who said that if the cocaine was not good he would take care of it. Raphael and Moore are both said to have referred dealers to one another. Also, Raphael once mediated a dispute between dealers. The government also says that the two men insulated themselves from the dirty work and reaped more profits than the other members of the conspiracy. The evidence of the profits primarily consists of expensive cars and real property. We are not, however, provided with information about what sort of profits other members of the conspiracy derived from the business. It is hard to guess how much more lucrative the business was to Raphael and Moore than to the others.

In fact, in sentencing Moore, the judge referred to the "limited information" available in the presentence report and relied on it and evidence at trial which, he concluded, supported, in fact mandated, the adjustment. He said that Moore and Raphael were the "the glue that kept this conspiracy together." Maybe that is true, but based on the findings which were made and the amorphous nature of the record on this point, we cannot tell whether the adjustments were imposed erroneously or not. We are not sure what specific facts form the underpinning of the adjustment. Where there is a paucity of findings and evidence, we remand for resentencing. *See United States v. Schaefer*, 291 F.3d 932 (7th Cir. 2002). A remand is appropriate in this case, particularly because the 4-level upward adjustment in this case is quite significant. It qualified Moore and Ra-

phael for life sentences. The adjustment is obviously provided in the guidelines to distinguish those in control of the drug business from those who participate in some lesser role, even if that role carries managerial responsibility. It should not be imposed where the evidence is vague at best.

In addition, there are facts which would seem to militate against the imposition of the adjustment. For example, when the operation began in 1991 Moore was approximately 17 years old. Raphael was 16 and living with his parents, who also were participants in the operation. Raphael argues compellingly that the evidence shows that this group was loose-knit and joined by friendship, as well as neighborhood and family ties. There is nothing remotely resembling a hierarchy which we find at the other end of the spectrum, say, with the Gangster Disciples. Accordingly, we are remanding for reconsideration of the adjustments.

Moore also contends that the court erred in holding him responsible for over 150 kilograms of cocaine and over 1.5 kilograms of crack. The argument is without merit. We review the drug-quantity calculation for clear error. *United States v. Hamzat*, 217 F.3d 494 (7th Cir. 2000). As the application note to U.S.S.G. §2D1.1 states, the drug quantity calculation does not need to be performed with mathematical precision. And a defendant's relevant conduct includes all reasonably foreseeable acts of others—acts undertaken in the course of the offense. On this issue, Judge Stadtmueller undertook a very detailed analysis. He ordered the government to prepare a drug quantity table, complete with transcript references. On its face the table showed that the defendants distributed over 360 kilograms of cocaine and over 19 kilograms of crack. After examining the evidence, the judge determined that 343 kilograms of cocaine and "close to 15 kilograms of crack cocaine" were attributable to the defendants. We cannot say that this finding was clearly erroneous.

Finally, Ellis Jordan objects to conditions imposed during his supervised release—which, we note, will not begin for quite awhile; in fact, not until he completes serving a long 180-month prison term. The conditions are that he participate in a program of testing and treatment for drug and alcohol abuse and that he refrain from using alcohol or from working in a tavern. Jordan did not object to these conditions at sentencing; consequently, our review is only for plain error. *United States v. Guy*, 174 F.3d 859 (7th Cir. 1999). While we can find no plain error on this record, we are constrained to say that the conditions appear to be a tad unnecessary. Jordan will have been in prison for nearly 15 years by the time the conditions kick in. Any drinking problem he might have had—and the government concedes there is little evidence that he has a drinking problem—might very well be effectively treated during his prison tour. He also has no history of working in a tavern; in fact, his employment history shows that he worked some 25 years for the same company—Rexworks. By the time he is released from prison he will be approximately 68 years of age. If he makes it that far, the poor fellow might well deserve a martini or a glass of Cabernet Sauvignon . . . . or at the very least a visit to a local tavern. On top of this, it seems to us that a busy probation office might well have better things to do than test someone like Jordan for drug or alcohol use a decade and a half from now. However, as we said, we cannot say that imposing the conditions constitutes plain error so we will not disturb them. That said, we would certainly not be aghast if the sage district judge were inclined to take another look at the situation.

Accordingly, the judgments of conviction for all defendants are AFFIRMED. The sentences of Paul Moore and Raphael Clayton are VACATED and REMANDED for reconsideration of the adjustment under U.S.S.G. §3B1.1(a) as indicated herein; the sentences, in all other respects and to all other defendants, are AFFIRMED.

**A true Copy:**

   **Teste:**

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—6-8-04