**UNITED STATES of America, Plaintiff,**

v.

**Bruce K. STEWART, Defendant.**

**No. CR.A. 02–62–1–JJF.**

United States District Court, D. Delaware.

July 16, 2004.

478

Colm F. Connolly, Esquire, United States Attorney, and Keith M. Rosen, Esquire, Assistant United States Attorney of the Office of the United States Attorney, Wilmington.

Samuel C. Stretton, Esquire of Samuel C. Stretton, West Chester, PA, for Defendant.

## OPINION

FARNAN, District Judge.

Pending before the Court is a Motion For A New Trial And Arrest Of Judgment (D.I.192), an Amended Post–Trial Motion (D.I.213) and a Second Supplemental Post–Trial Motion (D.I.219) filed by Defendant, Bruce K. Stewart. For the reasons set forth below, the Court will dismiss the motions as untimely, and in the alternative, deny the motions on the merits of the substantive claims raised therein.

## BACKGROUND

### I. Procedural Background

Defendant was indicted by the Grand Jury on ten counts involving a variety of drug and drug-related offenses, including: (1) conspiracy with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846 (Count I); (2) knowing possession of cocaine with intent to distribute on specific dates, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2 (Counts II through VIII); (3) violation of the Travel Act pursuant to 18 U.S.C. § 1952 (Count IX); and (4) money laundering on or about March 31 through April 3, 2000, in violation of 18 U.S.C. § 1956 (Count X). Defendant was also separately indicted on four counts of assaulting a Deputy United States Marshal in violation of 18 U.S.C. § 111(a).

Defendant was tried before a jury and found guilty on all counts of the first indictment on September 17, 2003. (D.I. 185). No post-verdict applications were made to the Court by Defendant following the jury's verdict. (G–60).[1] On September 30, 2003, Defendant filed a Motion For A New Trial And Arrest Of Judgment. (D.I.192). The Court ordered the Government to respond to the motion and gave Defendant the option to file a reply brief, if he wished. (D.I.206). Before the Government could respond to the motion, Defendant then requested an extension of time to supplement his motion. (D.I.210). The Court granted Defendant's request and simultaneously ordered the Government to file a response within thirty days of the date of Defendant's filing. (D.I.211). Defendant then filed an Amended Post–Trial Motion (D.I.213) on December 5, 2003, and the Government filed its response (D.I.217) contending that the motion is untimely, and in the alternative, that Defendant is not entitled to relief on the merits of his claims.

On January 20, 2004, Defendant filed a Second Supplemental Post–Trial Motion (D.I.219). The Government also filed a response to the supplemental motion (D.I. 220) reiterating its previous argument that Defendant's motion is untimely and contending that the additional arguments raised by Defendant are substantively without merit.

### II. Factual Background

At trial, the Government presented evidence that Defendant was introduced to Dennis Rawls, a resident of Los Angeles, California, by a mutual friend known as "Mike" or "J.D." (D–73). Defendant expressed to Mr. Rawls that he was interested in purchasing a kilogram of cocaine.

---

**1.** References to letters "A" through "G" are to the trial transcripts corresponding to each of the seven days of trial.

(D–76–77). Mr. Rawls later met with Defendant and Darnell Evans, whom Mr. Rawls knew as "Arc" or "Rob." (D–79). Mr. Rawls agreed to obtain the cocaine for Defendant and Mr. Evans, in exchange for $17,000, a $1,000 more than the price Mr. Rawls was being charged. (D–80–83). Approximately seven more drug transactions occurred between Defendant and Mr. Evans and Mr. Rawls in early 2000. (D–85).

The Government also presented evidence that Defendant and Mr. Evans contacted Alexis Outlaw about serving as a courier to transport drugs from Los Angeles to Delaware via commercial airline flights. (C–51–54). Ms. Outlaw was separately indicted on various drug charges and pled guilty to conspiracy with intent to deliver cocaine. (C–49). As part of her plea agreement, Ms. Outlaw agreed to testify on behalf of the Government. Explaining her role in Defendant's drug trafficking scheme, Ms. Outlaw testified that she agreed to act as a courier for Defendant, and she accompanied him to acquire false identification cards to use during their trip. (C–55–57, 60, 64). Ms. Outlaw then purchased plane tickets on ATA airlines with the false identification and money provided by Defendant. (C–60–61).

On January 14, 2000, Defendant and Ms. Outlaw flew to Los, Angeles California. During this trip, Ms. Outlaw carried $30,000 in cash in a girdle that she wore on the flight. (C–61). Defendant and Ms. Outlaw stayed at a Quality Inn hotel near the Los Angeles Airport. (C–62–63). From the hotel, Defendant contacted Mr. Rawls, whom Ms. Outlaw knew as "D," and Defendant and Ms. Outlaw drove to Mr. Rawls' home. (C–64–65). Ms. Outlaw testified that she observed Defendant purchase 1.5 kilograms of cocaine from "D." (C–66–67).

After the purchase, Defendant and Ms. Outlaw returned to the hotel, where Defendant packaged the cocaine with tortilla chip bags and dryer sheets to mask the scent of the cocaine. (C–58–59). The cocaine was then stored in Ms. Outlaw's suitcase for her return flight to Philadelphia. Once in Philadelphia, Ms. Outlaw retrieved the suitcase from baggage claim and ultimately delivered the suitcase with the drugs to Defendant and Mr. Evans. (C–70–71). Ms. Outlaw was compensated by Defendant and Mr. Evans for her services. (C–70–71).

Ms. Outlaw testified that she took six additional trips to Los Angeles to carry drugs for Defendant. (C–72). Ms. Outlaw was accompanied by Defendant on some trips, but on other trips she was accompanied by Mr. Evans or another courier, Josette Jacobs. (C–73–74). Ms. Outlaw used different fake identifications purchased by Defendant for the trips, but used the same mode of operation, purchasing airline tickets with cash from Defendant or Mr. Evans and storing cash for the transaction in her girdle or in a suitcase as the amounts of cash increased. (C–74–76). The Government also presented evidence that Defendant, Ms. Outlaw and Mr. Evans stayed primarily at the Quality Inn hotel, but that they also stayed at the Westin hotel and the Double Tree hotel on two separate occasions. (C–77–78; E231–236). Ms. Outlaw testified that she would rent cars for the travelers using her debit card, and her bank statements confirmed these rentals. (C–77–79; E–219). She further testified that Defendant and Mr. Evans would use cell phones to contact Mr. Rawls and that the amounts of cocaine purchased increased with each trip, ranging from 1.5 kilograms to thirteen kilograms. (C–83; D–85).

Ms. Outlaw also testified that she received cocaine in return for her services, but that she could not sell the cocaine quickly enough. As a result, Defendant

would retrieve the cocaine from her, sell it and pay her with the profits. (C–85–86).

Ms. Outlaw further testified that Defendant contacted her about taking an eighth trip in March 2000, using two suitcases to transport a large quantity of cash, but the trip was not completed. (C–89–90). Defendant arrived late at the airport and decided not to take the flight. (C–91–93). Instead, Defendant directed Ms. Outlaw to take one of the suitcases back to her house. Shortly thereafter, Ms. Outlaw's home was burglarized and the cash in the suitcase was stolen. (C–94). Ms. Outlaw testified that upon informing Defendant of the burglary, Defendant threatened to kill her if she did not return the money. (C–94–97). Ms. Outlaw then fled from her home and contacted the FBI. (C–98–99).

The Government also presented evidence that, in March 2000, Defendant and Mr. Evans recruited two additional couriers, Tina Johnson and Williesha Robinson to transport drugs from Los Angeles to Delaware. (E–41–46). Defendant used the same modus operandi with these couriers as he used with Ms. Outlaw. (E–41–48, 52). For one of the trips, Defendant recruited an additional assistant, Shannon Clark. (D–213). Clark testified that, at Defendant's request, she departed Philadelphia for Los Angeles on ATA Airlines, met with Mr. Evans, Ms. Johnson and Ms. Robinson, and rented a car in her name for Mr. Evans. (D–217–218). Although Ms. Clark intended to return to Philadelphia the same day, she was unable to do so. As a result, she stayed with the others at the Quality Inn hotel where she observed Mr. Evans packaging large amounts of cash. (D–220). Evidence was presented from the Quality Inn's records confirming that rooms were reserved during this trip under the aliases used by Ms. Robinson and Ms. Johnson. (E–64–65, 227–230).

The Government also presented evidence that Mr. Evans was unable to ac-quire the cocaine he sought during this trip (D–91). Tina Johnson testified that she overheard Mr. Evans talking on the phone about the failure of the "package" to arrive. (E–55). Ms. Johnson and Ms. Robinson were ultimately sent back to Philadelphia with the cash in their suitcases and $4,000 in each of their pocketbooks. (E–56, 60).

According to the Government, Ms. Johnson and Ms. Robinson were scheduled to arrive at the Philadelphia airport on the night of April 3, 2000. (E–238). FBI and DEA agents established surveillance at the airport and an FBI agent observed Defendant waiting at the gate for the plane's arrival. (E–239). As they disembarked the plane, Defendant gestured at Ms. Johnson and Ms. Robinson and followed them toward the baggage claim area. (E–240–244). DEA agents intercepted the women at the baggage claim area after the women retrieved their suitcases. (E–142–143). Both women gave consent to the agents to search their bags, although neither woman had keys for the suitcases. The agents found several forms of false identification, luggage claim checks, airline tickets and $4,000 in cash in each handbag. In the suitcases, the agents found clothing and large amounts of cash, later determined to be $66,410 in the aggregate. (E–144, 153, 158).

Ms. Johnson, Ms. Robinson and Defendant were arrested and taken to the DEA office in Philadelphia. (E–60). Ms. Johnson testified that during her time at the DEA office, Defendant made threatening statements to her in an attempt to intimidate her into lying about her involvement with him. (E–60–61). Ms. Johnson further testified that these threats continued at a preliminary hearing before the United States Magistrate Court for the Eastern District of Pennsylvania where Defendant made a throat slashing gesture toward her. (E–73–74).

The Government presented additional evidence that, in September 2000, two special agents, one from the FBI and one from the Internal Revenue Service, traveled with Ms. Outlaw to Los Angeles. (C–106–107, 224). Ms. Outlaw provided the agents with directions to "D's" house and identified Mr. Rawls to the agents as "D." (C–107–108, 229).

The Government also presented evidence of three drug transactions in Wilmington, Delaware between Defendant and Carlton McCrary. (D–251, 254, 256). Mr. McCrary testified that Defendant would brag to him about his cocaine connection in California and the lower prices he was obtaining for this cocaine, in an effort to induce Mr. McCrary to buy cocaine from him. (D–254–256). According to Mr. McCrary, he and his brother arranged to purchase an additional half-kilogram of cocaine from Defendant in December 2000. Although Mr. McCrary paid Defendant, he testified that he did not receive the cocaine. (D–258). The Government presented telephone records for the latter part of 2000, showing that Defendant attempted to reestablish contact with Mr. Rawls using a cellular phone subscribed to in the name of "Waali Zakie Bruton." (E–261–263). When Defendant was arrested in Los Angeles in May 2001, he possessed a false identification card in this name. (E–202–203).

In December 2001, law enforcement officers executed a federal arrest warrant for Mr. Rawls at his home. (E–248). When officers approached Mr. Rawls and identified themselves as being from Delaware, Mr. Rawls replied, "It must be about L.B.," referring to Defendant's nickname. (E–251). Mr. Rawls agreed to speak to the officers and gave them a full statement concerning his cocaine sales to Defendant and Mr. Evans. (E–253–258). Agents also found a slip of paper in Mr. Rawls' home with a cell phone number and the initials "L.B." Upon further investigation, it was found that the phone corresponding to this number was subscribed to by "Brushon Ali–Stewart." When Defendant was arrested on April 3, 2000, he carried an identification card in that name. (E–150–152).

The Government presented cellular phone records showing that the phones used by Defendant were in constant contact with Mr. Rawls between January 2000 and April 3, 2000. Roaming charges also showed that one of the phones, acquired for Defendant by Alison Butler, traveled between Delaware and California on the dates in question in January and February 2000. Additional phone records showed a high volume of calls between the phones used by Defendant and the phones used by Alexis Outlaw, Tina Johnson and Carlton McCrary. Phone records also showed a high volume of calls from these phones to ATA airlines. All calls from Defendant's phones ended abruptly the day before Defendant's arrest.

Defendant's attorney cross-examined each of the Government's witnesses and pointed out, among other things, that none of the participants ever tested or tried the cocaine that was allegedly being transported. Defendant's attorney also presented several witnesses in defense who testified about Defendant's various jobs. These witnesses testified that they never saw Defendant dealing drugs, and that Defendant had no assets, cars, real estate, businesses or money during the time period in question. Defendant invoked his Fifth Amendment right and declined to testify at the trial.

## DISCUSSION

### I. Whether Defendant's Motions Should Be Dismissed As Untimely

As a preliminary matter, the Government contends that Defendant's motions for a new trial and arrest of judg-

ment should be dismissed as untimely.[2] Pursuant to Federal Rule of Criminal Procedure 33, a motion for a new trial based on any grounds other than newly discovered evidence[3] "must be filed within 7 days after the verdict or finding of guilty, or within such further time as the court sets *during* the 7–day period." Fed.R.Crim.P. 33(b)(2) (emphasis added). Similarly, a motion for arrest of judgment must be made "within 7 days after the court accepts a verdict or finding of guilty ... or within such further time as the court sets *during* the 7–day period," Fed.R.Crim.P. 34(b) (emphasis added). The time period for the filing of these motions is a jurisdictional prerequisite, and therefore, the Court lacks jurisdiction to consider an untimely filed motion under Rules 33 or 34.[4] *See e.g. United States v. Gaydos*, 108 F.3d 505, 512 (3d Cir.1997); *see also* 3 Charles Alan Wright, Nancy J. King & Susan R. Klein, *Federal Practice & Procedure Criminal 3d* § 573.

The calculation of the 7–day time period is governed by Federal Rule of Criminal Procedure 45. Pursuant to Rule 45, the date of the act or event that begins the period is excluded, and intermediate Saturdays, Sundays and legal holidays are also excluded. Fed. R. Crim P. 45(a)(1),(2). The last day of the time period is included; however, unless it is a Saturday, Sunday, legal holiday, or day on which weather or other conditions make the clerk's office inaccessible. Fed. R. Crim P. 45(a)(3). Rule 45 also permits the Court to extend the time period on its own motion or for good cause in certain circumstances; however, such extensions do not apply to the time frames set forth in Rules 33 and 34. Fed.R.Crim.P. 45(b)(2) ("The court may not extend the time to take any action under Rules 29, 33, 24 and 35, except as stated in those rules.").

Applying Rule 45 in this case, Defendant's post-trial motions were due September 26, 2003.[5] Defendant did not request

2. Defendant does not expressly move for judgment of acquittal, but the Government contends that, to the extent his motion can be construed as a motion for judgment of acquittal based on the sufficiency of the evidence, the motion is also time barred. The Court disagrees that such a motion is time-barred. During trial, Defendant's counsel indicated that he wished to demur generally to the charges. (F–86, 87). Defendant's counsel made his motion prior to the close of the Government's case-in-chief, because Defendant's counsel indicated that he had only one point to raise in support of his demurrer, and did not want to break again for arguments on the issue. The Court indicated that his motion would be recognized as being interposed at the conclusion of the Government's case and therefore timely made. The Court reserved judgment on the motion, and no ruling was made prior to the return of the jury's verdict. Accordingly, Defendant's motion for judgment of acquittal is pending, and the Court will address it on the merits in Section III of the Discussion in this Opinion.

3. A motion for a new trial based on newly discovered evidence must be filed within

three years after the verdict or finding of guilty. Fed.R.Crim.P. 33(b)(1). Defendant does not assert any claims based on newly discovered evidence, and therefore, Rule 33(b)(1) is not applicable in this case. To the extent that Defendant's Second Supplemental Motion can be said to raise newly discovered evidence in the form of the sentences given to Defendant's co-defendants, the Court denies the motion on the merits for the reasons set forth *infra*.

4. Some courts have permitted untimely filed Rule 34 motions on the theory that lack of jurisdiction or failure of the indictment to charge an offense may be raised at any time; however, this basis for rendering Defendant's motion timely is unavailable here. Wright & Miller, *supra* at § 537. Defendant's Rule 34 motion makes no claims regarding jurisdiction or the sufficiency of the indictment, and as discussed *infra*, Defendant's Rule 34 motion fails to state a cognizable claim.

5. The date of the jury's verdict on September 17 is excluded, and therefore, September 18 is counted as day 1 and September 19 is

any extensions during the pendency of the 7–day period, and the Court did not provide any extensions during that time period. Accordingly, Defendant's motions, filed on September 30, 2003, are untimely, and any amendments or supplements to those motions are also untimely.[6] *Cf. United States v. Bramlett,* 116 F.3d 1403, 1405 (11th Cir.1997) (holding that renewed motion for a new trial is barred, when made outside the post-verdict 7–day period and outside of any extension granted *during* that period); *United States v. Newman,* 456 F.2d 668, 669–670 (3d Cir.1972) (recognizing that Rule 33 motion may not be amended to include new grounds after expiration of 7–day period prescribed in rule).

That the Court granted Defendant an extension of time to supplement his motions also does not render Defendant's motions timely filed. Defendant's original motions were time-barred, prior to any extension requested by Defendant, and therefore, any supplements or amendments that would have related back are also untimely. Further, the Court would have had to grant Defendant an extension during the pendency of the 7–day time period in order to enlarge that period. Because Defendant's motions and any subsequent supplements and amendments are untimely, the Court lacks jurisdiction to consider them. Accordingly, the Court will dismiss Defendant's motions and any related supplements or amendments.

## II. Whether, In The Alternative, Defendant's Rule 34 Motion Should Be Denied For Failure To State A Cognizable Claim

Defendant also moves pursuant to Rule 34 to arrest judgment. As an alternative to its timeliness argument, the Government contends that Defendant's Rule 34 motion should be denied for failure to state a cognizable claim.

■ Pursuant to Federal Rule of Criminal Procedure 34, only two grounds are recognized to support a motion for arrest of judgment: (1) the indictment or information does not charge an offense; or (2) the court does not have jurisdiction of the charged offense. Fed.R.Crim.P. 34(a)(1),(2). Defendant's motion raises no allegations supporting Rule 34 relief, and therefore, the Court will deny Defendant's Motion To Arrest Judgment and any amendments or supplements thereto for failure to state a cognizable claim. *See e.g. United States v. Taylor,* 1992 WL 333589, *4 (E.D.Pa. Nov.9, 1992); *United States v. Geary,* 1988 WL 94315, *1 (E.D.Pa. Sept.7, 1988).

## III. Whether, In The Alternative, Defendant's Amended Post–Trial Motion And Second Supplemental Motion Should Be Denied On The Merits

■ In the alternative, even if the Court has jurisdiction to consider the merits of Defendant's motion for a new trial, the

counted as day 2. September 20 and 21 were a Saturday and Sunday respectively, and therefore, those days are excluded from the calculation. September 22 is counted as day 3, September 23 as day 4, September 24 as day 5, September 25 as day 6 and September 26 as day 7.

**6.** The Government notes in its response brief that the Clerk's office was inaccessible on September 18 and 19 due to the effects of Hurricane Isabel. However, as the Government points out, Rule 45 only allows for additional time due to inclement weather if the Clerk's office is inaccessible on the last day the brief is due. Fed.R.Crim.P. 45(a)(3). Defendant did not move for any extensions during the 7–day period as a result of the hurricane, and Defendant does not contend that his motions were untimely filed as a result of the hurricane. Accordingly, the closing of the Clerk's office has no effect on the Court's conclusion that Defendant's motions are untimely.

Court concludes that Defendant is not entitled to a new trial. The Court likewise concludes that Defendant is not entitled to relief on his motion for judgment of acquittal made during the course of the trial. A motion for judgment of acquittal and a motion for a new trial are governed by two different standards. The standard for granting a motion for judgment of acquittal based on insufficient evidence to sustain a conviction is quite stringent. *United States v. Briscoe–Bey*, 2004 WL 555405, *1 (D.Del. Mar.19, 2004). The defendant bears a heavy burden of demonstrating that relief is appropriate, and the granting of relief under Rule 29 is " 'confined to cases where the prosecution's failure is clear.' " *Id.* (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir.1984)). The Court must view the evidence in the light most favorable to the Government and may not weigh the evidence or make credibility determinations. *United States v. Giampa*, 758 F.2d 928, 934–935 (3d Cir. 1985). Relief is only appropriate "if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir.1987) (citing *United States v. Castro*, 776 F.2d 1118, 1125 (3d Cir.1985)). Stated another way, the Court must determine whether "a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all the elements of the offenses." *United States v. Salmon*, 944 F.2d 1106, 1113 (3d Cir.1991); *Coleman*, 811 F.2d at 807.

 In contrast, a motion for a new trial is reviewed under a more lenient standard. Pursuant to Rule 33, the Court may grant a new trial if it is required in the interest of justice. In determining if a new trial is warranted, the Court may weigh the evidence and consider the credibility of witnesses. However, the Court may not set aside the jury's verdict merely because it reaches a different conclusion than the jury. *See United States v. Ntreh*, 2003 WL 23517145, *1 (D.Vi. Nov.24, 2003). Rather, a new trial is only warranted if (1) after weighing the evidence, the Court determines that there has been a miscarriage of justice, or (2) the Court determines that a trial error had a substantial influence on the verdict. *United States v. Beeson*, 2002 WL 1459406, *1 (D.Del. June 17, 2002). Thus, while the standard of review for a new trial is more lenient, relief should only be granted sparingly and in exceptional situations. *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir.), *cert. denied*, —— U.S. ——, 124 S.Ct. 248, 157 L.Ed.2d 178 (2003). The decision to grant a new trial rests within the sound discretion of the Court. *Id.*

## A. Whether The Jury's Guilty Verdict Was Against The Weight Of The Evidence

By his motions, Defendant contends that the jury's guilty verdict is against the weight of the evidence, because the Government failed to prove that the substance purchased and sold was cocaine.[7] Defendant points out that the Government never seized or scientifically tested the alleged cocaine and no cocaine was ever presented as evidence during the trial. Defendant also contends that the witnesses who testified that the substance being sold was cocaine were unreliable.

 It is well-established that the Government may use lay testimony and circumstantial evidence to satisfy its burden

---

7. It appears to the Court that Defendant never fleshed out his arguments in support of his demurrer at trial. However, based upon the content of his post-trial motions, it is evident that his only argument concerns whether the evidence was sufficient to demonstrate that the substance allegedly possessed by Defendant was cocaine.

of proving the identity of a controlled substance. *Griffin v. Spratt,* 969 F.2d 16, 22 n. 2 (3d Cir.1992). Direct evidence and scientific lab analysis is not required, so long as the circumstantial evidence presented is sufficient to enable the jury to identify the substance beyond a reasonable doubt. *Id.* (citing *United States v. Schrock,* 855 F.2d 327, 334 (6th Cir.1988)). Courts have accepted a wide-range of circumstantial evidence, including but not limited to: (1) evidence regarding the physical appearance of the substance; (2) evidence that the substance was used by someone familiar with the effects of the controlled substance and the substance produced the anticipated or desired effects; (3) evidence that the substance was used in the same manner as a controlled substance; (4) evidence that the substance was sold and/or purchased at a high price and in cash; (5) evidence that the transactions involving the substance were carried out in secrecy or by covert means; and (6) evidence that the substance was referred to as the controlled substance by the defendant or others in his presence. *United States v. Bryce,* 208 F.3d 346, 353–354 (2d Cir.1999) (citing *United States v. Dolan,* 544 F.2d 1219, 1221 (4th Cir.1976)).

■ Reviewing the evidence presented by the Government in light of the standard of review for both a motion for a new trial and a motion for judgment of acquittal, the Court concludes that the evidence adduced by the Government was sufficient to establish that Defendant possessed cocaine as charged in the indictment. Through the testimony of Alexis Outlaw, Dennis Rawls and Carlton McCrary, the Government presented four different types of circumstantial evidence, i.e. evidence regarding the physical appearance of the substance as known by previous users and sellers, the price paid for the substance, the covert manner in which the transactions involving the substance were carried out, and the reference by Defendant and others to the substance as cocaine. Alexis Outlaw was both a prior cocaine user and dealer. (C–58). Based on her experience, Ms. Outlaw identified the substance in question as cocaine. Ms. Outlaw explained that the substance was originally presented as a "brick" wrapped in thick plastic with masking tape, and Ms. Outlaw explained to the jury that a "brick" refers to a kilogram of cocaine. Ms. Outlaw also described loose powder stored in Ziploc freezer bags. (C–67, 80–81, 83). Ms. Outlaw testified that she knew the selling price for cocaine in both Wilmington and California, and that the amounts of money she carried in exchange for the drugs in California were consistent with the selling price. (C–163). She also testified that she was paid in cocaine for her services, and that Defendant sold the substance for her and gave her amounts consistent with the selling price for cocaine. (C–71, 85, 171–172). Ms. Outlaw also testified as to the covert scheme by which she transported cocaine for Defendant. She explained the way in which both the money for the drugs and the drugs that were received were transported, including Defendant's instructions regarding the packaging of the cocaine in suitcases with dryer sheets and tortilla chips to mask the scent of the drugs. (C–68–69).

In addition to the testimony of Ms. Outlaw, the Government also produced the testimony of Defendant's cocaine supplier, Dennis Rawls. Mr. Rawls testified about conversations he had with Defendant in which Defendant asked Mr. Rawls to provide him with cocaine, and Mr. Rawls testified that the substance he sold to Defendant was cocaine. (D–76–77, 83–85).

The testimony of Carlton McCrary, a crack cocaine dealer, was also presented to establish that the substance in question was cocaine. Mr. McCrary testified that he was familiar with the selling prices for cocaine and with the physical appearance

of cocaine. Mr. McCrary also testified that he knew how to cook cocaine powder into crack. (D–252, 270). Mr. McCrary testified that the substance he purchased from Defendant was cocaine. (Tr. D–251, 256, 277). In addition, Mr. McCrary testified about conversations he had with Defendant in which Defendant offered to sell him cocaine, boasted about the source of his cocaine supply and explained the covert manner in which he transported the drugs using female couriers. (D–254–258).

Defendant contends that the Government's evidence is insufficient, because it did not include any testimony that the substance in question was sampled by a person who was familiar with the effects of cocaine. Although this is one form of acceptable circumstantial evidence, it is not the sole form. Indeed, even the cases cited by Defendant acknowledge that drug identity may be established in several ways, only one of which is the testimony that the drugs were consumed and produced the desired effects. *See Dolan*, 544 F.2d at 1221. Further, at least one court has expressly rejected the need for testimony by users of the actual substance, *United States v. Harrell*, 737 F.2d 971, 978 (11th Cir.1984), and others have implicitly found that such testimony is not required by finding evidence similar to the evidence presented in this case to be sufficient to establish the identity of the substance as a controlled substance without reference to actual use of the substance in question by an experienced drug user. *See e.g. United*

*States v. Wright*, 16 F.3d 1429, 1439 (6th Cir.1994); *United States v. Baggett*, 954 F.2d 674 (11th Cir.1992). As the *Harrell* court explained, "identification based on past use coupled with present observation of the substance at hand will suffice to establish the illicit nature of a suspected substance." *Harrell*, 737 F.2d at 978.

In this case, the Government presented precisely the type of evidence discussed in *Harrell* through the testimony of individuals familiar with cocaine, as well as additional forms of circumstantial evidence, including Defendant's statements about the substance in question. Assessed in the light most favorable to the Government, the Court finds this evidence to be sufficient to enable a reasonable jury to find that Defendant possessed cocaine. Weighing the evidence without favor to either party, the Court also finds that the Government established beyond a reasonable doubt that Defendant possessed cocaine. Accordingly, the Court concludes that Defendant is not entitled to a judgment of acquittal or a new trial on the grounds that the Government failed to prove that the substance in question was cocaine.[8]

B. *Whether The Court's Decision To Deny A Mistrial Based On Remarks In The Prosecutor's Opening Statement Which Were Later Unproven By The Prosecution Was Erroneous*

Defendant next contends that the Court erred in denying his request for a mistrial

---

8. Defendant makes a similar argument that the prosecution did not prove beyond a reasonable doubt the weight of the substance possessed. Defendant was charged in Counts II through VIII pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(C), which does not require the government to prove a particular drug quantity as an element of the offense. *See e.g. Petersen v. United States*, 2003 WL 22836477, *13 (D.Vi. Nov.24, 2003). Count I charged Defendant with conspiracy with in-

tent to distribute more than five kilograms of cocaine; however, the precise weight of the substance is also not an element of this offense, as only an agreement to violate the narcotics law alleged is required. *See e.g. United States v. Toro*, 359 F.3d 879, 883 (7th Cir.2004). Accordingly, the Court concludes that Defendant is not entitled to relief on his claim regarding a failure of proof as to drug quantity.

based upon the prosecutor's remarks during his opening statement that Defendant admitted in a previous case that he was a drug dealer.[9] Defendant contends that he could not cross-examine this statement and that it tainted Defendant's case, because the Government ultimately did not prove the truth of the remarks made in its opening statement.

Defendant moved for a mistrial immediately after the Government stated that Defendant admitted in a previous case that he was a drug dealer. The Court denied the motion for a mistrial on the grounds that the prosecutor's statement was consistent with the Court's prior ruling in limine concerning the admissibility of Defendant's admission. (C–31–32, 44; E–17, 23–24). Later in the case, the Government agreed not to introduce Defendant's statement, so long as Defendant agreed not to reference the Government's failure to prove the statement. (E–20–24). Defendant agreed to this arrangement and did not raise any objection to the Government's decision to forgo proving this statement. Because Defendant did not object on this basis, the Court concludes that any error based on the Government's failure to prove the remarks made in its opening statement should be reviewed under the plain error standard. *See United States v. Tyler,* 281 F.3d 84, 100 (3d Cir.2002).

To establish plain error, the Defendant must prove that (1) the court erred, (2) the error was obvious under the law at the time of review, and (3) the error affected substantial rights. *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). If Defendant establishes all three prongs, the Court may, but need not exercise its discretion to order relief. The Court's discretion should

be exercised to grant relief only where the error seriously affects the integrity of the outcome of the trial. *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

■ A prosecutor's opening statement is meant to be an objective summary of the evidence that the prosecution reasonably expects to produce. *Frazier v. Cupp,* 394 U.S. 731, 736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *United States v. Retos,* 25 F.3d 1220, 1226 (3d Cir.1994). The failure to produce certain evidence or testimony referenced in an opening statement does not necessarily result in a mistrial. Rather, the jury's verdict need only be vacated if the remarks, taken in the context of the trial as a whole, were "sufficiently prejudicial to have deprived the defendant of his right to a fair trial." *Retos,* 25 F.3d at 1226. It is particularly difficult to find a prejudicial error based on the failure to prove a statement made in a prosecutor's opening summary where the prosecutor did not tout to the jury that the statement was a crucial part of its case, and the court provided the jury with cautionary statements that the prosecutor's statement is not considered evidence. *Frazier,* 394 U.S. at 735, 89 S.Ct. 1420.

■ In this case, the Court cautioned the jury that the statements made by the lawyers were not evidence, and that the jury must not speculate about what witnesses might have said. (C–19, G–20). In addition, the prosecutor's statement in his opening summary was a passing reference and was not portrayed to the jury as a critical part of its case. The Government made no further reference to this statement in its case, and Defendant agreed not

9. Specifically, the prosecutor stated:
 You will hear that last year the defendant was a witness in a state case. And he testified as a witness in this state case. He swore under oath, like every witness you will see in this case and he said, under oath, that he is a drug dealer. (C–31–32).

to reference the statement. In these circumstances, the Court concludes that the prosecutor's subsequently unproven statement was not so prejudicial as to impair Defendant's right to a fair trial. *See U.S. v. Chirinos*, 112 F.3d 1089, 1098–1099 (11th Cir.1997) (concluding that prosecutor's remarks concerning evidence later held to be inadmissible did not prejudice jury, and that any prejudice was adequately cured by court's cautionary instructions to jury that counsel's statements did not constitute evidence); *cf. United States v. DeRosa*, 548 F.2d 464, 466, 472 (3d Cir. 1977) (concluding that court's decision to deny mistrial was not plain error where government recited wiretap evidence in opening statement, evidence was later held inadmissible and court gave curative instructions regarding difference between evidence and argument). Accordingly, the Court concludes that its decision to deny Defendant's motion for a mistrial was not erroneous, and therefore, Defendant is not entitled to a new trial on this ground.

C. *Whether The Court Erred In Allowing Testimony Regarding Defendant's Threats To Witnesses*

Defendant next contends that the Court erred in permitting threat testimony from two witnesses, Alexis Outlaw and Tina Johnson. The Court will address each of Defendant's contentions separately.

1. Threat testimony given by Alexis Outlaw

With regard to Alexis Outlaw, Ms. Outlaw testified on redirect examination that she kept guns in her home for protection

as a result of threats made against her.[10] Defendant contends that no evidence was presented that Defendant made these threats, and Defendant was in jail at the time of the alleged threats. Thus, Defendant contends that the jury could have erroneously assumed that Defendant made these threats, and therefore Ms. Outlaw's testimony was highly prejudicial such that his motion for a mistrial should have been granted.

■ Pursuant to Federal Rule of Evidence 403, relevant evidence may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice. The district court has broad discretion to weigh evidence under this standard. *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir.1986). With respect to threat evidence in particular, the Third Circuit has discussed the balance that must be exercised between the prosecutor's "need for the evidence" and the prejudicial nature of the evidence. *Id.* 786–787. Factors relevant to the prosecutor's need for the evidence include "the importance and centrality to the ultimate issue in the case of the fact sought to be proved by the threat evidence, and the availability of other evidence to establish the fact sought to be proven by use of the threat evidence." *Id.* Factors relevant to the prejudicial nature of the evidence include "the tendency of the particular conduct alleged to 'suggest decision on an improper basis, commonly, though not necessarily, an emotional one,' the nature or style of the specific witness's narrative; the likelihood the testimony is true; and the suffi-

---

10. Ms. Outlaw's testimony on redirect examination was as follows:
Q: Were those your guns?
A: Yes.
Q: Why did you have those guns?

A: For my protection

Q: Protection from what?

A: I had been threatened from the time of the home invasion back in March of 2000 up until December of 2001.
(C–192–193).

ciency of the other evidence presented to make a reasonable connection between the defendant and the offense charged." *Id.* (citations omitted).

 Applying the Rule 403 balancing test, the Court concludes that it did not abuse its discretion in admitting Ms. Outlaw's testimony concerning threats against her and declining to grant Defendant's motion for a mistrial. On cross-examination, Defendant's counsel questioned Ms. Outlaw about the guns police found in her home in an attempt to discredit her. Having opened the door to this issue, the Government was entitled on redirect examination to inquire into the reasons for Ms. Outlaw's gun possession in order to rebut the negative inference about Ms. Outlaw created by Defendant's cross-examination. Further, Ms. Outlaw had already testified regarding threats made against her by Defendant, and therefore, the Court is not persuaded that her reference to any additional threats was unduly prejudicial. Accordingly, the Court concludes that Ms. Outlaw's testimony did not create the type of unfair prejudice contemplated by Rule 403.

Defendant directs the Court to *United States v. Vaulin,* and contends that a mistrial is warranted, because the Court did not give a curative instruction that the threats referred to by Ms. Outlaw were unrelated to Defendant. However, such a curative instruction was not required in this case, because Ms. Outlaw's prior testimony connected Defendant to the threats made against her. By contrast, in *Vaulin,* the testimony concerning the threats against a witness was clearly irrelevant, as the prosecutor conceded that the threats had nothing to do with the defendant. In addition, the prosecutor in *Vaulin* elicited the testimony to counteract the defendant's contention on cross-examination that the witness made a "sweet deal" with the government. However, the *Vaulin*

court concluded that such testimony was unnecessarily prejudicial, because the fact that the witness was incarcerated was, by itself, a sufficient reason to explain why he would enter into a deal with the prosecutor to shorten his incarceration. Courts that have taken a similar approach have concluded that threat testimony is inappropriately admitted where the record suggests that the prosecutor is using the evidence under a pretext, i.e. more to prejudice the defendant than to explain away the witness's conduct. *See e.g. Dudley v. Duckworth,* 854 F.2d 967, 972 (7th Cir.1988) (holding that threat testimony was unfairly prejudicial where prosecutor introduced threat testimony to explain why witness was nervous, but there was no need to introduce such threat testimony other than to prejudice defendant).

In contrast, courts have permitted witnesses to testify about perceived threats to explain conduct that would otherwise damage a witness's credibility. *See e.g. United States v. Gatto,* 995 F.2d 449 (3d Cir.1993); *Gomez v. Ahitow,* 29 F.3d 1128, 1139 (7th Cir.1994). For example, in *Gomez,* the witness had delayed over ten months in going to the police with eyewitness information she had about the homicide in question. Through his questioning of the witness, the prosecutor elicited that the witness delayed coming forward because she received threats that her son would be killed. The court concluded that the witness's threat testimony was appropriately admitted, because the prosecutor could reasonably assume that the delay in coming forward would hurt her credibility, and therefore, an explanation was appropriate. In other words, the threat testimony was not a pretext for prejudicing the defendant, but rather, a legitimate attempt to rehabilitate the witness's credibility.

Similarly, in *Gatto,* the court permitted the prosecutor to question the witness

about his fear of defendant to demonstrate why the witness had become hostile to the government during cross-examination. Specifically, the witness, who had cooperated with the prosecution, stated on cross-examination that he had been pressured by the government to testify and that the law enforcement officers involved in the case were corrupt. On redirect, the prosecutor elicited testimony that one of the defendant's associates had been standing in the courtroom during the witness's testimony, and that the witness feared he would be beaten by the defendant. Affirming the trial court's decision to allow this testimony, the Third Circuit concluded that it was admissible under Rule 404(b) to impeach the witness's testimony on cross-examination, and to show consciousness of guilt by the Defendant, and that the evidence was not unduly prejudicial.

Like the circumstances in *Gomez* and *Gatto,* the prosecutor in this case used Ms. Outlaw's testimony to explain away conduct that would otherwise have damaged her credibility. Accordingly, the prosecutor had a legitimate basis for eliciting this testimony, and the Court concludes that it was not unfairly prejudicial.

In the alternative, however, even if the Court erred in admitting Ms. Outlaw's testimony, the Court concludes that such an error was harmless. *See* Fed. R.Crim.P. 52. The improper admission of evidence does not require the Court to vacate the jury's verdict "if it is highly probable that the error did not contribute to the judgment." *United States v. Tyler,* 281 F.3d 84, 101 n. 26 (3d Cir.2002); *United States v. Dispoz–O–Plastics, Inc.,* 172 F.3d 275, 286 (3d Cir.1999). Stated another way, the court must be certain that any error did not prejudice the defendant. *Dispoz–O–Plastics,* 172 F.3d at 286.

In this case, the jury already heard testimony from Ms. Outlaw that Defendant threatened her in March 2000. In

light of this testimony, the Court is persuaded that the testimony concerning subsequent threats is insufficient to prejudice Defendant. Further, given the strength of the evidence presented in this case, the Court finds it highly probable that the error, if any, did not contribute to the judgment. The Government presented the testimony of Defendant's drug supplier, two of his couriers, and one of his customers, all of whom testified that Defendant operated a conspiracy to transport and sell cocaine. The testimony of these witnesses was corroborated by phone records, hotel receipts, and bank records. In light of the overwhelming evidence against Defendant, the Court is certain that Defendant was not prejudiced by any alleged error in the admission of Ms. Outlaw's threat testimony, and therefore, Defendant's motion for a new trial based on the improper admission of threat testimony will be denied.

### 2. Threat testimony given by Tina Johnson

Defendant also contends that he was prejudiced by the threat testimony given by Tina Johnson. Ms. Johnson testified that Defendant threatened her while they were detained at the DEA offices in Philadelphia and again, during a hearing in Pennsylvania during which Defendant made a throat slashing gesture. Defendant contends that these threats were undocumented, and that Ms. Johnson's testimony unfairly prejudiced Defendant.

The type of threat evidence elicited by the Government from Ms. Johnson is admissible to demonstrate consciousness of guilt, if the evidence is more probative than prejudicial under Rule 403 and an appropriate limiting instruction is provided, if requested by a party. *See United States v. Mickens,* 926 F.2d 1323, 1328 (2d Cir.1991) (discussing Fed.R.Evid. 404(b) and noting that evidence of prior bad acts

is admissible if offered for a purpose other than to prove defendant's bad character or criminal propensity and evidence is not unfairly prejudicial), *Guerrero,* 803 F.2d at 785. Reviewing the parties' arguments and the evidence in question in light of the applicable law, including the balancing test under Rule 403, the Court concludes that it did not err in admitting Ms. Johnson's testimony regarding Defendant's threats against her. As the Court explained on the record, the prosecutor offered this evidence to establish a link between Defendant and Ms. Johnson and to explain Ms. Johnson's prior inconsistent statements. (E–30, 31). Ms. Johnson's threat testimony was also relevant to establish consciousness of guilt. As the applicable case law demonstrates, these reasons are all valid reasons for the introduction of threat testimony. In addition, the Court concludes that the probative value of the evidence substantially outweighed the prejudicial nature of the evidence. Ms. Johnson's testimony was necessary to link Defendant to the drug conspiracy and rebut Defendant's assertion that he was only picking up Ms. Johnson from the airport and had no idea that she was involved in a drug conspiracy. (E–30–31). The prosecutor did not dwell on this testimony, and the Court is not persuaded that it was unduly prejudicial in these circumstances.

Defendant suggests that there is no documentation of the alleged threats, and therefore, Ms. Johnson's testimony is inherently unreliable such that it should have been excluded. Defendant's assertion is incorrect both factually and legally. As a legal matter, Defendant's argument goes more to the weight to be given the evidence than its admissibility. As a factual matter, the testimony of DEA agents corroborated Ms. Johnson's testimony concerning the threats she received from Defendant (E–157–158), and Defendant was free to challenge the credibility of the DEA agent's testimony by pointing out that the threats were not documented in their reports. Further, Defendant's throat slashing gesture was non-verbal, and thus, could not be recorded, but again Defendant was free to question Ms. Johnson's credibility with regard to her testimony. Accordingly, the Court concludes that Ms. Johnson's threat testimony was properly admitted into evidence and was not unfairly prejudicial. In the alternative, the Court concludes that any error was harmless for the reasons discussed by the Court in the context of Ms. Outlaw's threat testimony. Accordingly, Defendant's motion for a new trial on this basis will be denied.

D. *Whether The Court Erred In Admitting Evidence That Defendant Had False Identification In His Possession When He Was Arrested In April 2001*

Defendant next contends that the Court erred in admitting evidence that Defendant possessed false identification when he was arrested in May 2001. Defendant contends that this evidence was highly prejudicial, because the arrest occurred a year and a half after Defendant's alleged involvement in the charged drug conspiracy. Defendant also contends that the jury could have improperly inferred that Defendant was a bad person, and that this evidence of unrelated, bad conduct tainted the trial.

In pertinent part, Rule 404(b) provides:

Other Crimes, Wrongs, or Acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. *It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,* provided that upon request by the accused,

the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b) (emphasis added). Thus, the prohibition of Rule 404(b) is not invoked if the evidence is offered as direct proof of the crime charged. *United States v. Givan*, 320 F.3d 452, 463 (3d Cir.2003). In this regard, uncharged criminal activity is not considered "other crimes" evidence prohibited by Rule 404(b), if that activity "arose out of the same transaction or series of transactions as the offense charged, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir.1997).

 Applying these principles to the evidence in dispute, the Court concludes that it did not err in admitting testimony that Defendant carried false identification. This evidence was not admitted to show that Defendant committed an unrelated wrong in the form of carrying false identification. To the contrary, the Government introduced this evidence to demonstrate Defendant's involvement in the crimes charged. *See United States v. Ojomo*, 332 F.3d 485, 488–489 (7th Cir.2003) (holding that evidence of false identification cards in defendant's house was direct proof of fraudulent application scheme and not prohibited Rule 404(b) evidence). After introducing the testimony of a retired FBI Special Agent that Defendant identified himself as Waali Zakie Bruton at the time of his arrest and possessed an identification card in that name, the Government then introduced cellular phone records in the name of Waali Zakie Bruton. (E–202,

203). These records showed a number of telephone calls made in late 2000 to a pager belonging to Dennis Rawls. Dennis Rawls testified that he supplied cocaine to Defendant, and Carlton McCrary testified that he arranged to purchase cocaine from Defendant during this same time frame. (E–262, D–258). During closing arguments, the prosecutor used the testimony of the FBI Agent concerning Defendant's false identification to link Defendant to the phone used to call Mr. Rawls and thereby corroborate the testimony of other Government witnesses that Defendant purchased drugs from Mr. Rawls. (F–214). Because Defendant's use of false identification was direct evidence of the crimes charged, the Court concludes that it was admissible without regard to the prohibition of prior bad acts under Rule 404(b).[11] *See United States v. Hargrove*, 929 F.2d 316, 317–320 (7th Cir.1991) (finding that evidence, consisting of, among other things, cash and pagers, constituted direct evidence of defendant's participation in charged conspiracy, even though evidence was discovered at defendant's arrest ten months after the alleged end of the conspiracy); *United States v. Loayza*, 107 F.3d 257, 263–264 (4th Cir.1997) (finding that evidence relating to defrauding of victim in late 1992 and early 1993 was direct evidence of scheme to defraud, even though indictment charged that scheme continued through December 1993 with last fraudulent mailing in March of 1992).

 In the alternative, even if the Court erred in admitting the testimony and evidence regarding Defendant's "Bruton" alias, the Court concludes that such an error is harmless. Throughout the trial, the jury heard testimony that defendant used various aliases and false identi-

---

**11.** The Court further notes that this evidence was not unduly prejudicial under Rule 403, as the only possible prejudice resulting from this evidence was its tendency to link Defendant to the crimes charged. *See Hargrove*, 929 F.2d at 320.

fication cards. Thus, it is difficult to conclude that the use of an additional alias at the time of his arrest would prejudice the jury. Further, as the Court has discussed, the evidence of Defendant's guilt was substantial, and thus, it is highly unlikely that Defendant's conviction was based on his use of a false identification card. Accordingly, the Court will deny Defendant's motion for a new trial based on the admissibility of Defendant's false identification card.

### E. Whether The Court Erred In Its Rulings On Defendant's Pre-trial Motions

Defendant next requests the Court to incorporate its previous motions into the current motions and to reconsider its previous rulings on the issues of outrageous conduct by the Government, pre-arrest delay, and pre-arrest delay in reference to any statements made by Defendant. Defendant does not add any additional argument with respect to these issues, and the Court has detailed its rulings in written decisions entered prior to trial. (D.I.168, 169, 170, 171, 172). The Court finds no reason to depart from its previous rulings, and the Court does not believe that its rulings require augmentation. Accordingly, the Court concludes that further discussion of these issues is not warranted.

### F. Whether The Court Erred In Excluding The Testimony Of Defense Witness, Kenneth Fassett

Defendant next contends that the Court erred in excluding the testimony of Kenneth Fassett, a defense witness. According to Defendant, Mr. Fassett was going to testify that he spoke to Mr. McCrary, and Mr. McCrary told Mr. Fassett that he was going to give false testimony against Defendant in order to help himself.

Relying on Rule 613(b), the Court concluded at trial that this testimony was not admissible, because Mr. McCrary was not confronted with the alleged statements he made to Mr. Fassett. (F–91–97). The Court's ruling was not erroneous. Rule 613(b) provides:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Although the Third Circuit has recognized that this rule does not necessarily require that the witness be cross-examined about the alleged prior inconsistent statement before that statement may be presented as impeachment evidence, the Third Circuit has also recognized that the district court retains the discretion to determine the sequence required to establish the proper foundation for Rule 613(b) evidence. In *United States v. Schnapp*, the Third Circuit concluded that the district court did not abuse its discretion in declining to permit the defendant to introduce testimony regarding a witness's prior inconsistent statements when that witness was not given the opportunity to be confronted with the statement, even if the Government could have recalled the witness to address the statement. 322 F.3d 564, 571 (8th Cir.2003). In so ruling, the Third Circuit recognized that the procedure of recalling a witness to deny or explain a statement is not mandatory, but optional at the trial judge's discretion.

In this case, Defendant did not request to re-open the cross-examination of Mr. McCrary and did not call Mr. McCrary in its own case. Thus, Defendant could have, but chose not to, comply with Rule 613(b), and therefore, the Court concludes that its decision to exclude this testimony was not erroneous.

■ Defendant further contends that Mr. Fassett's testimony was admissible on other grounds, because it was "testimony of an admission of falsity by the witness." (D.I. 213 at 44). However, use of Defendant's testimony to prove the truth of the matter asserted, i.e. that Mr. McCrary lied on the stand is inadmissible hearsay under Federal Rule of Evidence 801. Moreover, the use of Mr. Fassett's testimony was also impermissible under Federal Rule of Evidence 608(b), because it was extrinsic evidence offered to attack Mr. McCrary's character for truthfulness. Thus, the purposes for which Defendant contends he would have introduced the testimony are impermissible, and therefore, the Court would not have admitted the evidence on these grounds.

In sum, the testimony of Mr. Fassett was admissible for the limited purpose of impeaching Mr. McCrary; however, the Court was not required to permit Defendant to introduce this testimony without first confronting Mr. McCrary with it. Accordingly, the Court's decision to exclude Mr. Fassett's testimony was not erroneous, and therefore, Defendant's motion for a new trial on this basis will be denied.

### G. Whether Defendant's Due Process Rights Were Violated By The Court's Decision To Empanel An Anonymous Jury And Require Defendant To Wear A Stun Belt During Trial

Defendant next contends that his rights to due process, a fair jury and a fair trial were violated by the Court's decision to empanel an anonymous jury and require Defendant to wear a stun belt during the trial. The Court will consider each of Defendant's claims in turn.

#### 1. Use of a stun belt

■ Defendant first contends that his rights were violated by the Court's decision to have him wear a 50,000 volt R–E–A–C–T stun belt system during the course of the trial. Defendant contends that use of the stun belt was unnecessary, because Defendant was not disruptive during any of the Court's hearings. Defendant also points out that he was previously tried within the Delaware state court system without violent episode, and therefore, Defendant's prior conduct did not justify the use of a stun belt. Defendant contends that the belt was uncomfortable and psychologically intimidating, and that wearing the belt inhibited Defendant from being able to fully participate with his counsel in his trial.

■ The responsibility for maintaining courtroom order and security rests with each court. United States v. Theriault, 531 F.2d 281, 284 (5th Cir.1976). To further these legitimate goals, courts have sanctioned the use of stun belts and have concluded that the use of such devices does not shock the conscious or otherwise impair a defendant's due process rights. See e.g. United States v. McKissick, 204 F.3d 1282, 1298 (10th Cir.2000); United States v. Brooks, 125 F.3d 484, 502 (7th Cir.1997); United States v. Brazel, 102 F.3d 1120, 1156–1158 (11th Cir.1997). In determining whether to use a stun belt, courts have considered such factors as: (1) the seriousness of the crimes charged and the severity of the potential sentences; (2) the allegations of threats and violence made by the defendant against witnesses; (3) the defendant's previous guilty pleas or convictions of prior gun charges and/or violent crimes; (4) belligerent or threatening comments made by the defendant to U.S. Marshals; (5) allegations of gang activity and/or the likelihood that associates or rivals of the defendant may be present in the courtroom; (6) the opinion of the U.S. Marshal as it relates to knowledge of security in the courthouse and with cases of this nature; (7) potential prejudice to the

defendant; (8) the likelihood of accidental activation of the stun belt; (9) the potential danger to the defendant if the belt is activated; (10) the availability of other means to ensure courtroom safety; (11) the potential danger for the defendant and others present in the courtroom if other means are used to secure the courtroom; and (12) the existence of a clear written policy governing the activation of stun belts worn by the defendants.

Considering these factors in this case, the Court concludes that its decision to require Defendant to wear a stun belt was not erroneous and did not deprive Defendant of his due process rights. Defendant was charged with serious crimes and faces a serious sentence. Specifically, Defendant was charged with leading a cocaine conspiracy involving more than 40 kilograms of cocaine. Although Defendant has not yet been sentenced, he faces characterization as a career offender with the possibility of a life sentence.

With respect to Defendant's demeanor toward others, the record indicates that Defendant made numerous threats to kill and/or intimidate witnesses, including Ms. Outlaw and Ms. Johnson, both of whom testified during the trial. In addition, Defendant's prior record and his past conduct supports the Court's decision to require Defendant to wear a stun belt. Defendant's prior record included a conviction for assault, and at the time of his pretrial detention, Defendant faced additional charges of escape, reckless endangering and carrying a firearm without a license in Pennsylvania. Defendant was also separately indicted on four counts of assaulting Deputy U.S. Marshals who were responsible for transporting Defendant in 2001, so he could stand trial on attempted homicide charges. As detailed by the criminal complaint, Defendant threw a table at one U.S. Marshal and attempted to bite the hand of another. (D.I.217, Exh. 3). Defendant

took these actions while shackled, which further suggests that more stringent security measures were required to secure Defendant and ensure the safety of others in the courtroom. In addition, as the Court emphasized on the record at trial, the United States Marshal recommended the use of a stun belt given Defendant's prior actions and the overall safety concerns posed by Defendant's trial. (A–3–7).

Although Defendant suggests that he could not participate with his counsel as a result of the stun belt use, Defendant does not outline any specific instances in which Defendant's participation in the trial was hampered, and the Court observed no difficulty in communication and/or participation between Defendant and his counsel. Further, the Court took several measures to ensure that Defendant would not be prejudiced by the use of the stun belt. The jury could not see the stun belt, and the Court gave strict instructions that the stun belt was not to be used for any verbal actions taken by Defendant. Rather, the Court restricted any use of the stun belt to actual physical aggression by Defendant, and the Court noted that the stun belt permitted the Marshals to provide Defendant with warnings, before administering the full 8 seconds of shock. (A–3, 6). The Court's instructions in this regard were in addition to the written policy of the Marshal's service, which was provided to Defendant. This policy explained the circumstances under which the stun belt may be used, and pursuant to the customs and practices of the U.S. Marshal's Service, Marshals are instructed to use alternative measures or provide Defendant with a warning before activating the stun belt. (D.I.217, Exh. 5, ¶ 7). Further, to the Court's knowledge the stun belt was not activated during trial, and there is no evidence that the jury noticed the belt on Defendant, and therefore, the Court is persuaded that

Defendant was not prejudiced by the use of the stun belt. *See e.g. McKissick,* 204 F.3d at 1299; *United States v. Joseph,* 333 F.3d 587, 591 (5th Cir.2003).

In addition, the Court notes that the type of belt used in this case has been approved by other courts for its low error rate. *McKissick,* 204 F.3d at 1298; *Brooks,* 125 F.3d at 502; *United States v. Durham,* 219 F.Supp.2d 1234 (N.D.Fla. 2002); *United States v. O'Driscoll,* 250 F.Supp.2d 443 (M.D.Pa.2002). As the affidavit of Deputy U.S. Marshal Denny explains, the device used in this case was equipped with a plastic guard over the activation trigger to decrease the risk of accidental activation, and the U.S. Marshal's service confirmed that Defendant had no pre-existing medical conditions which would preclude the use of a stun belt. (D.I. 217, Exh. 5 at ¶ 4). In addition, courts have recognized that the device uses a low amperage which has no electrical effect upon the wearer's heart or internal organs and is sufficient to only immobilize Defendant. *See Durham,* 219 F.Supp.2d at 1238. Defendant has not rebutted the assertions of Deputy Marshal Denny and has not come forward with any case law or other evidence supporting his assertion that use of a stun belt is inhumane. In these circumstances, the Court is persuaded that the risk of any lasting danger to Defendant as a result of wearing the belt was low, and any potential dangers were sufficiently minimized by the device's safety triggers and the precautions taken by the U.S. Marshal's service with respect to the device's use and activation. *Durham,* 219 F.Supp.2d at 1238–1239; *Edelin,* 175 F.Supp.2d at 3.

In sum, the Court is persuaded that the circumstances in this case supported the Court's decision to implement the U.S. Marshal's recommendation and require Defendant to wear a stun belt. Defendant faced serious charges, had threatened witnesses, and demonstrated by his past actions and criminal record that violent outbursts and attempted escape were real and legitimate concerns. The Court balanced these security concerns with Defendant's rights by limiting the use of the stun belt and taking measures to ensure that the jury would not be aware of its presence on Defendant's body. Accordingly, the Court concludes that Defendant was not prejudiced and his rights were not violated by the Court's decision to require him to wear a stun belt, and therefore, the Court will deny Defendant's motion for a new trial.

### 2. Use of leg shackles

Defendant's counsel also complained in his original post-trial motion that Defendant was required to wear leg shackles during the trial. However, Defendant did not raise this issue in his Amended Motion. To the extent that Defendant did not abandon this issue, the Court concludes, for the reasons discussed in the context of the stun belt use, that the Court did not err in requiring Defendant to wear leg shackles. The Court had both counsel's tables skirted and positioned so that the jury could not observe Defendant's shackles (A–4), and the Court observed no actual difficulties in communication or participation by Defendant in the trial as a result of his leg shackles. *Joseph,* 333 F.3d at 591 (finding no prejudice to defendant where no evidence existed that jurors observed stun belt and shackles); *Yates v. United States,* 362 F.2d 578, 579 (10th Cir.1966) (finding no prejudice to defendant where there was no evidence any juror observed him wearing shackles in the courtroom). Accordingly, the Court concludes that Defendant was not prejudiced or denied his due process rights as a result of his leg shackles, and therefore, the Court will deny Defendant's motion for a new trial.

### 3. Empaneling an anonymous jury

Defendant next contends that his due process rights to a fair trial were violated by the Court's decision to empanel an anonymous jury. Defendant contends that it is difficult to pick a jury when the last name and exact location of the prospective juror's residence is withheld, and therefore the selection process was tainted. Defendant also contends that his right to a fair jury was violated, because it is highly likely that the jurors figured out that they were selected anonymously and this could have given them the impression that Defendant was extremely dangerous.

 The decision to empanel an anonymous jury lies within the discretion of the district court; provided that the court's discretion is grounded in legitimate concerns for juror safety, courtroom security and protecting court proceedings from outside influences. *United States v. Scarfo*, 850 F.2d 1015, 1021, 1023 (3d Cir. 1988); *United States v. Thornton*, 1 F.3d 149, 154 (3d Cir.1993); *United States v. Eufrasio*, 935 F.2d 553, 574 (3d Cir.1991). The Third Circuit has recognized that the district court's decision to empanel an anonymous jury is entitled to particular deference, because the district court is especially familiar with the "local ambience" surrounding a criminal trial. In determining whether an anonymous jury should be ordered, courts have considered such factors as (1) pretrial publicity from prior related cases that may contribute to juror apprehension; (2) any history of violence by the defendant; (3) the severity of the charges facing the defendant; and (4) any

claims that the defendant previously intimidated witnesses. *See Thornton*, 1 F.3d at 154; *Scarfo*, 850 F.2d at 1023–1024. In making its determination, the court is not required to conduct an evidentiary hearing and is not required to record its reasons for ordering an anonymous jury when the jury is empaneled.[12] *Eufrasio*, 935 F.2d at 574.

 Examining the circumstances in this case in light of the applicable legal principles, the Court concludes that its decision to empanel an anonymous jury was not erroneous. Defendant was charged with the serious crime of drug distribution of more than 40 kilograms of cocaine, and at the time of his trial, was also facing charges for assault, weapons possession and escape. The allegations forming the basis for these charges demonstrate physical violence by Defendant against others, including law enforcement personnel, as Defendant was charged with assaulting and attempting to assault four Deputy United States Marshals. Defendant's violent history is further evidenced by his past conviction for second degree assault.

In addition to these charges and convictions, Defendant was also tried in state court in 2002 on attempted homicide charges. Although Defendant was acquitted of these charges, the publicity related to the charges was substantial, and therefore, the possibility that jurors were aware of this trial presented the Court with a viable concern that jurors may be apprehensive to serve on Defendant's jury. Fur-

---

**12.** The trial court's failure to articulate express findings when it impanels the jury is not reversible error. However, the Third Circuit noted that it is a better practice for trial judges to record their findings and reasoning when the jury is empaneled. *Eufrasio*, 935 F.2d at 574. In this case, the Court briefly outlined some of its reasons on the record after hearing argument from the parties and intended to supplement its reasoning with subsequently issued written orders. Because this issue was also raised post-trial, the Court will augment its reasoning in conjunction with its rulings on the instant motion, and will not issue further orders as they would be repetitive of the Court's discussion here. (A–25, 28–30).

ther, the Government presented evidence that Defendant attempted to intimidate two witnesses who testified during the trial, Alexis Outlaw and Tina Johnson. The Government also informed the Court that a judicial officer found probable cause for finding that a government witness had been intimidated by Defendant's sister a few days before trial, and that evidence existed that the husband of Defendant's sister also acted in an intimidating manner toward another witness.

Considering these circumstances, the Court is persuaded that its concerns for juror safety, courtroom security and protecting the integrity of the trial were viable and legitimate. Accordingly, the Court concludes that it did not abuse its discretion in ordering an anonymous jury.

Defendant suggests that his ability to select a jury was impaired because his counsel did not know the juror's names and addresses. However, Defendant does not offer any support for his claim, and the Third Circuit has expressly concluded that the practice of withholding jurors' names, addresses and places of employment does not deprive the defense of the information it needs to conduct an effective voir dire and exercise its peremptory challenges. *Scarfo*, 850 F.2d at 1022. Indeed, in this case, Defendant's counsel expressly indicated that he did not need to know where the jurors lived to be able to select them. Further, the Court provided Defendant with the occupations and hometowns of the jurors, and offered Defendant the opportunity to request supplemental questions during the voir dire process. Accordingly, the Court is not persuaded that Defendant's right to select a jury was impaired.

In addition, Defendant contends that it is "highly likely" that the jury knew it was anonymous, and therefore, the jury could have had the impression that Defendant was very dangerous. The Court is not persuaded by Defendant's argument. The Court took several precautions to avoid the jury learning that it was selected anonymously. For example, the Court advised the jury that the number system for identifying potential jurors is used for the selection of all juries in federal court, which it is. (B–67). Thus, Defendant's claim that the jurors knew they were being treated differently to the extent that Defendant was not given their names and street addresses is based on speculation, and therefore, in the Court's view, it is insufficient to support the relief requested.

To the extent that Defendant suggests that the jury should have been instructed that it was anonymously empaneled, the Court finds no basis for such an instruction. Although the Third Circuit concluded in *Scarfo* and *Thornton* that such an instruction was not erroneous, the court did not require such an instruction in all cases.

In sum, the Court concludes that its decision to empanel an anonymous jury and to withhold that fact from the jury was not erroneous. As a substantive matter, the Court concludes that the seriousness of Defendant's charges, his past history of violence, and the evidence of threats made by Defendant and his associates against witnesses all support the Court's decision to require an anonymous jury. As a procedural matter, the Court acted consistently with other trials in selecting the jury by number such that the jurors would have no reason to suspect that they were being treated differently. In addition, the Court took all reasonable precautions to ensure that Defendant had ample opportunity and information to voir dire the jury. Accordingly, the Court concludes that Defendant has not demonstrated that a new trial is warranted based on the Court's decision to empanel an anonymous jury.

### H. Whether Defendant Is Entitled To Relief On The Merits Of Issues Raised In His Original Post–Trial Motion, But Not Included In His Amended Post–Trial Motion

Defendant raises two issues in his original Motion For A New Trial And Arrest Of Judgment which were not raised in his Amended Post–Trial Motion. The Government presumes these issues were abandoned, but addresses them in the alternative. Accordingly, the Court will address these issues, as well.

 First, Defendant contends that the Court erred when it permitted the hearsay statement of Josette Jacobs, identifying certain suitcases under the present sense impression or excited utterance exceptions to the hearsay rules. However, the Government ultimately did not introduce Jacobs' statement into evidence, and therefore, Defendant's claim of error is denied as moot.

 As for Defendant's argument that a new trial is warranted, because the Government's witnesses were untrustworthy based on their cooperation agreements, the Court concludes that Defendant's argument is without merit both under the standard for a new trial and the standard for judgment of acquittal based on the sufficiency of the evidence. On a motion for judgment of acquittal, the Court may not assess the credibility of witnesses. The Court may only determine if the evidence was sufficient to permit a reasonable jury to find Defendant guilty of the crimes charged, beyond a reasonable doubt. As the Court has previously discussed, the evidence against Defendant was overwhelming, and therefore, sufficient to enable a reasonable jury to find Defendant guilty of the crimes charged. Accordingly, the Court concludes that Defendant's claim regarding the witnesses' credibility is insufficient to warrant judgment of acquittal.

 Similarly, while the Court may consider the witnesses' credibility on a motion for new trial, such motions should only be granted sparingly, if the Court determines that there has been a miscarriage of justice or a trial error that had a substantial influence on the jury's verdict. In this case, the Court is not persuaded that the testimony of the Government's witnesses was inherently unreliable, because they testified pursuant to cooperation agreements. *See United States v. Luna*, 265 F.3d 649, 651 (8th Cir.2001) (recognizing that testimony of witnesses pursuant to cooperation agreements does not render their testimony so suspicious that district court abused its discretion in failing to grant new trial). The Government introduced credible evidence corroborating the statements of these witnesses, and therefore, weighing the evidence as a whole, the Court is persuaded that a miscarriage of justice has not occurred as a result of the jury's verdict. Accordingly, the Court concludes that a new trial is not warranted based on the alleged unreliability of the Government's witnesses.

### I. Whether Defendant Is Entitled To Relief On The Merits Of His Second Supplemental Post–Trial Motion

By his Second Supplemental Post–Trial Motion, Defendant alleges that the Government misled the jury, because it gave the jury the impression that certain Government witnesses were not going to be given lenient or favorable treatment as a result of their testimony. Defendant contends that Ms. Outlaw and Mr. McCrary were given very lenient sentences, and that the Government should have been candid about these sentences with the jury so that the jury could properly evaluate the witnesses' credibility.

Reviewing the testimony of these witnesses, the Court concludes that the Gov-

ernment did not mislead the jury regarding the witnesses' cooperation agreements. Mr. McCrary admitted on direct examination that he was hoping for a reduction in his sentence, and acknowledged that the Government had the discretion to file a substantial assistance motion. Mr. McCrary also admitted that he did not know what benefits he would receive from his testimony. (D–249, 276, 285–286).

Similarly, Ms. Outlaw testified that she was testifying pursuant to a plea agreement, but that she also did not know what sentence the Court would impose. However, Ms. Outlaw also testified that she was testifying in order to obtain a reduced sentence. (C–49, 113).

Indeed, neither these witnesses nor the Government, could know what sentences the Court would impose, because any discretion in sentencing resides with the Court. The fact that the Government may have intended to seek a reduced sentence for these individuals also does not guarantee that the Court would reduce their sentences. *See e.g. United States v. Bailey,* Cr. Action No. 00–23–GAS (D.Del. Mar. 5, 2002) (denying substantial assistance motion filed by Government for cooperating co-conspirator). Thus, the Court's decision to impose a more lenient sentence for these witnesses than Defendant thought would be imposed does not mean that the Government misled the jury regarding these witnesses.

Defendant also contends that he was denied his right to due process and a fair trial, because his counsel was given redacted versions of Mr. McCrary's statements to law enforcement officers concerning his cocaine dealings. Defendant contends that he was not given the names of people that Mr. McCrary allegedly talked with and that he could have called these witnesses to testify to rebut Mr. McCrary's testimony. Thus, Defendant contends that exculpatory material was withheld from Defendant. An unredacted version of the document in question was produced to the Court for *in camera* review, and the Court found that the redactions were appropriate.

■ To establish a *Brady* claim based on the withholding of exculpatory evidence, the defendant must first come forward with a colorable claim that the withheld evidence contained exculpatory material. *United States v. Ramos,* 27 F.3d 65, 71 (3d Cir.1994). Speculation that evidence contained exculpatory material is insufficient to state a *Brady* violation. *Id., see also United States v. Williams–Davis,* 90 F.3d 490, 514 (D.C.Cir.1996), *cert. denied,* 519 U.S. 1128, 117 S.Ct. 986, 136 L.Ed.2d 867 (1997); *United States v. Bastanipour,* 41 F.3d 1178, 1181 (7th Cir.1994).

In this case, Defendant's claim that exculpatory evidence was withheld is based on speculation. Defendant does not know the names of the individuals involved with Mr. McCrary, and therefore, he has no basis upon which to assert that exculpatory evidence was withheld.

■ Further, even if the persons named in the reports would have denied dealing with Mr. McCrary thereby raising questions about Mr. McCrary's credibility, such evidence would be inadmissible under Federal Rule of Evidence 608(b) as extrinsic evidence elicited for the purpose of attacking a witness' credibility. Thus, these witnesses could not have been called to testify as to whether or not they ever dealt drugs with Mr. McCrary. *See United States v. McNeill,* 887 F.2d 448, 452–453 (3d Cir.1989). Further, this type of evidence is clearly collateral to Defendant's case, and therefore, the Court would not have admitted the evidence on this basis, as well. *See e.g. United States v. Beauchamp,* 986 F.2d 1, 3–4 (1st Cir.1993) (collecting cases). Because the evidence

Defendant contends was improperly withheld would not have been admissible, the Court also concludes that it is not material for purposes of the *Brady* rule. *See United States v. Oxman*, 740 F.2d 1298, 1311 (3d Cir.1984), *vacated on other grounds*, *United States v. Pflaumer*, 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985). Further, given the collateral nature of this evidence coupled with the overwhelming evidence of Defendant's guilt, the Court is persuaded that there is no reasonable probability that the results of the proceeding would have been different if the redacted evidence had been disclosed. *See Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Accordingly, the Court concludes that a new trial is not warranted on *Brady* grounds.

## CONCLUSION

For the reasons discussed, the Court will dismiss as untimely Defendant's Motion For A New Trial And Arrest Of Judgment (D.I.192), Amended Post–Trial Motion (D.I.213) and Second Supplemental Post–Trial Motion (D.I.219). In the alternative, the Court will deny Defendant's Motion For A New Trial And Arrest Of Judgment (D.I.192), Amended Post–Trial Motion (D.I.213) and Second Supplemental Post–Trial Motion (D.I.219) on the basis of the substantive claims asserted therein.

An appropriate Order will be entered.

## *ORDER*

At Wilmington, this 16th day of July 2004, for the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendant's Motion For A New Trial And Arrest Of Judgment (D.I.192), Amended Post–Trial Motion (D.I.213) and Second Supplemental Post–Trial Motion (D.I.219) are DISMISSED as untimely.

2. In the alternative, Defendant's Motion For A New Trial And Arrest Of Judg-

ment (D.I.192), Amended Post–Trial Motion (D.I.213) and Second Supplemental Post–Trial Motion (D.I.219) are DENIED on the substantive basis of the claims raised therein.